# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

MOUNTAIN COPPER CO., Limited, v. VAN BUREN et al.

(Circuit Court of Appeals, Ninth Circuit. October 19, 1904.)

No. 1,049.

1. MASTER AND SERVANT—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

The testimony of a number of witnesses that the timbering in a copper mine did not reach to the roof, or back of the stope, by several feet, and that for several hours before the caving in of the roof, by which plaintiff's intestate, working in the mine, was killed, pieces of rock kept falling from the roof upon and through the timbers, was sufficient to authorize the submission to the jury of the question of the negligence of the defendant mining company in failing to keep the mine properly timbered.

2. INSTRUCTIONS—FORM—REFUSAL OF REQUESTS.

The court is not required to give instructions in the language used by counsel, but its duty is fully discharged if its charge embraces all of the principles of law arising in the case in its own language.

3. SAME.

It is the duty of the court to simplify its charge to the jury, and the practice of taking the instructions as requested by the respective parties, and from them formulating a general charge embracing all the matters of law arising upon the pleadings and evidence, is always to be commended, because in this way the points in issue may be sufficiently declared and clearly presented to the jury, without unnecessary repetition.

4. SAME—EXCEPTIONS—SUFFICIENCY AND TIME FOR TAKING.

In the federal courts, exceptions to the charge are of no avail unless the record shows that they were taken and the points of exception designated while the jury were at the bar; and it is improper practice to permit formal exceptions to be then noted, and the specification of objection to be supplied in the record later; the object of the rule being that the attention of the trial court shall be called to the precise point to which exception is taken while it may be remedied.

5. MASTER AND SERVANT—ASSUMED RISK.

An inexperienced person going to work in a mine assumes only the ordinary risks incident to his employment, and, where he has nothing

---

¶ 5. Assumption of risks incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.

133 F.—1

to do with the timbering of the mine, he has the right to assume that it is properly done by his employer, unless advised to the contrary, or the danger is obvious.

6. APPEAL—REVIEW—INADVERTENT EXPRESSION IN INSTRUCTIONS.

A judgment should not be reversed because of inadvertent expressions in the charge, to which the attention of the trial court was not called, and which evidently did not affect the verdict.

7. MASTER AND SERVANT—ACTION FOR KILLING OF SERVANT—INSTRUCTIONS.

The charge of the court considered, in an action against a mine owner to recover for the death of an employé killed by the caving of the mine, and *held*, taken as a whole, and construed together, to state the law of the case fully and correctly.

8. EVIDENCE—RELEVANCY TO ISSUES.

On an issue as to defendant's negligence in failing to properly timber a mine, by reason of which, as alleged, there was a cave, and plaintiff's intestate was killed, where defendant had shown by an expert witness that a cave might occur in a mine properly timbered, it was not error to exclude testimony as to particular causes which might produce it, when there was no evidence that any such cause existed at the mine in question.

9. WITNESSES—CROSS-EXAMINATION.

Where a disinterested witness had testified to the defective timbering of a mine in which he was a workman, at the place where a cave occurred which killed plaintiff's intestate, the court properly excluded a question on cross-examination as to whether he suggested to the foreman that the place was dangerous, as a matter which could not bind the plaintiff, and did not tend to impeach the witness.

In Error to the Circuit Court of the United States for the Northern District of California.

For former opinion, see 123 Fed. 61.

This is a suit to recover damages for the death of John Van Buren, occasioned by the alleged negligence of the plaintiff in error. A brief outline of the general character of some of the facts of this case will be sufficient to illustrate the points raised by the assignments of error:

The defendants in error are the sole heirs at law of John Van Buren, deceased, to wit, his widow and three children. About February 10, 1900, John Van Buren went to Iron Mountain, in Shasta county, and sought employment with the Mountain Copper Company, the plaintiff in error herein. He had no experience as a miner, but was a bridge carpenter. He was engaged by the corporation as a carpenter, but was first put to work in the rock quarry. After he had worked there a few days he was ordered by the foreman in charge of the work to go to work as a mucker in the mine. (A mucker is one who, after the ore or muck has been mined by the miners, shovels it into cars, and then moves it out to the surface of the mine.) He first declined to go to work in the mine, on account of his inexperience in such work. His foreman told him he would have to go to work in the mine, or quit work. He continued working in the mine as a mucker.

The mine of the Mountain Copper Company is not a vein or ledge of mineral-bearing rock or ore in place, but is a large, lenticular mass of ore, and is mined by drifting or tunneling into the ore body from the mountain side, and stoping out the ore in large chambers or sections. The superintendent of the plaintiff in error at the time of the death of Van Buren testified that: "The shape of the deposit I can liken to the hull of a ship, with the prow pointing to the south, and the west side of the mass flatter or at less pitch than the east side."

On February 28, 1900, about 12 o'clock p. m., or early in the morning of March 1st, a cave occurred in the mine. Several workmen, including Van Buren, were killed. Some idea of the extent of this cave is gleaned from the testimony of witnesses that it took from 12 to 14 days to recover the bodies. The cave occurred in what was known as stope 4 in the Copper level. At the

time of this accident the mine consisted of three opened-up levels, known as the Fielding, the Copper, and the Peck levels. The Fielding was the lowest level of the three; the next level was the Copper level; above that, the Peck level. The distance between the top of the Fielding level and the bottom of the Peck level was 38 feet, and the distance between the top of the Copper level and the bottom of the Peck level was 14 feet, at the place where the accident occurred.

Counsel for the plaintiff in error, in his brief, epitomizes the method of working the mine, as shown by the testimony of its witnesses, as follows: "The system under which the mine of plaintiff in error was worked was peculiar. Going in upon any given level, a drift was run into the ore body; and, working forward from this drift as a base, the ore was stoped out along the side of the drift. The drift was timbered up to the roof, bracing the roof, and then, as the miners worked forward, stoping out the ore, the timbering was advanced towards the face of the stope; the ground back of the point at which the ore was being extracted being filled in between the timbering with country rock; this filling in, together with the timbering, supporting the weight of the mountain above; room at all times being allowed for mining and mucking in the face of the stope. The timbering was in square sets. As the ore was stoped out these sets of timbers were advanced towards the face of the stope, and, whenever sufficient room was obtained, complete sets were put in. In the meantime timbers were projected from over the completed sets, resting upon the edge of such sets, and at the back end against the roof of the mine; extending out over the place where the miners were working, to protect them as much as possible from loose and falling rock."

The trial of the case before a jury resulted in a verdict in favor of the defendants in error for the sum of $6,750. The plaintiff in error seeks a review in this court, and makes 26 assignments of error, which may be classified under four different heads: (1) That the court erred in refusing to direct the jury to render a verdict in favor of the defendant; (2) that the court erred in refusing to give instructions (nine in number) requested by defendant's counsel; (3) that the court erred in instructing the jury (four instructions); (4) that the court erred in sustaining objections (eight in number) of plaintiff to certain questions asked witnesses by defendant.

Van Ness & Redman, for plaintiff in error.

Geo. O. Perry and Campbell, Metson & Campbell, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after making the foregoing statement). 1. Did the court err in refusing to instruct the jury to find for the defendant in the court below (plaintiff in error here)?

The arguments of counsel upon this point cluster around the proposition as to whether or not there is any evidence in the record showing or tending to show any negligence on the part of plaintiff in error; the contention of the defendants in error being that the evidence shows that the cave occurred by reason of the insufficient and negligent timbering of the mine by the plaintiff in error, and its failure to take the necessary precaution to protect the workmen therein, or to take any reasonable steps to secure their safety; the contention on the part of the plaintiff in error being that the mine was properly timbered; that the cave occurred, or might have occurred, by what is called by its witnesses a "side thrust," without any fault or negligence or want of reasonable care or precaution on its part to secure the safety of its employés. These contentions call for a brief review of the testimony offered by the respective parties upon this point. The defendants in er-

ror introduced witnesses who testified, among other things, as follows:

Nickerson testified that he worked in stope 4 of the Copper level with Van Buren and others; that he quit working before the accident because he was hit in the head with a rock that came out of the timbers from above; that he heard rocks fall on the lagging; that he could see the roof 25 or 30 feet from the bottom, 12 feet above the height of the timbers; that there was an open space above the timbers of about 12 feet.

Anderson testified that he worked in stope 4, at the point where the cave occurred, a few days before the accident; that "the last morning I worked there I observed rocks dropping from the roof or back of the stope. Some of the rocks struck the timbers and the lagging, and some of them fell out in the ground. The stope was not timbered up to the roof. * * * During the time I worked there, there was a considerable cave from the roof or back of the stope."

Fayle testified that he worked in the Copper level on February 28th, when Paul Edwards, the shift boss of the plaintiff in error, took the men out to wait until the ground quit settling. "Rocks fell there that night from the place where it had caved the day before where I was working. There must have been fifty or sixty cars in the cave of the day before. The timbermen that day put in a false set there to protect the muckers from the falling rock. * * * The Oats boys timbered in there that night. They were working there at the time of the accident, and were killed. * * * I worked there until about 10 o'clock, when Paul Edwards, shift boss, called us out. It quit settling then, and Paul Edwards said he thought it was all right, and we all went back to work. I quit there then because I thought the place looked dangerous. I told Paul Edwards I didn't want any more of that, and he said I could go over and work in line 3. When I left, the Oats boys were starting in to lag up over the sets they had put in."

Pemberthy testified: That he was familiar with all branches of mining. That he understood timbering, stoping, and blasting; that he was working in the stope on the Copper level "at the time of the cave in which eight men were killed. * * * I was in sight of the men who were working in the stope, and who were afterwards killed. I could see them that night. I was working there at the time of the cave. The material that came down fell where I was working, after I got out." That he had helped to open all the stopes in question. That he had made an examination of the timbers on the night of the accident, and gave a minute description of how the timbering was done, and said there was lots of open ground above the timbers. That he was 6 feet 1½ inches tall, "and could stand on top of those timbers without stooping, and my head did not touch the roof." That where the cave occurred the ground was broken and settling. That "the timbering that was in there, and on top of which and between which and the roof there was no cribbing, did not serve any purpose at all in holding up the roof. * * * I saw rock falling the night of the accident, before the cave. A piece dropped down as big as my head every once in a while, and once in a while a car load would drop down. It would come down in broken pieces." During the course of his testimony the following questions and answers appear:

"Q. by Mr. Perry: From what you have seen and know of the mine at the time the accident occurred, on the morning of the 1st of March, 1900, would you say that that portion of stope 4 where these men were working was in a safe condition for men to be put to work in? A. I would testify it was not. Q. And why would you say it was not? A. The fact that the timbers— The back was not properly caught up."

And at another point, with reference to the falling of the cave:

"Mr. Perry: Q. What I want to know, Mr. Pemberthy, is, did it come down suddenly, or was there a gradual cracking and popping? A. It came down suddenly in that portion of the stope, and then it started to cave both ways. Q. The center of the stope, so far as you could judge, caved first? A. Yes, sir. Q. And it came down with a sudden crash? A. Yes, sir. Q. And then the cave extended? A. Both ways. Q. So far as you could tell? A. Yes, sir."

Lundwick testified that he was timbering at the place where the accident occurred the day before and the night of the accident until a late hour; he was on top of the timbers, and could see it was open above; that the timbers did not reach up so as to support the roof or back of the stope; that many places were not cribbed; that a cave occurred the evening before the accident which broke down the staging upon which they were working putting in timbers; that a man working with him who stood on top of the timbers could not reach the back of the stope without extending the six-foot staff or pole. He gave in detail the manner in which the timbering was done, and upon his cross-examination by Mr. Van Ness:

"Q. Do you know to what extent along the line of that stope cribbing had been put in above the timbering, say between line 4 and line 5? Do you know to what extent along the timbering had been cribbed up to the roof? A. I know some places it was not. Q. In how many places was it not cribbed? A. I do not know. Q. About how many? A. A good many. I do not think it was more than half cribbed. Q. You would say, as a matter of fact, that about half the timbering was cribbed, and about half of it was not cribbed? A. Well, something like that, and even then some of the cribbing was not wedged up tight at all."

Prater testified that there was from 10 to 12 feet of open space above the timbers; that the timbers did not support the roof; that he did not think it was a safe place, and his brother-in-law, Paul Edwards, who was the shift boss there, changed him, on account of the dangerous condition, to work in line 3.

Roberts testified that he was in the stope where the accident occurred between the hours of 9 and 10 o'clock on the night of the accident; that he noticed the ground was caving away all of the time and falling; that rock filling from the Peck level came down into the Copper level at the time of the cave.

Davis testified that Van Buren declined to go to work in the mine on account of inexperience as a miner; that the shift boss, Woods, told him he would have to go to work in the mine or quit his job; that on the night of the accident the shift boss, Paul Edwards, warned him (Davis) not to go through that stope, because it was not safe; that the timbering did not reach up to the roof; and that the timbers in that place were set on loose muck.

The witnesses on behalf of the plaintiff in error, especially the superintendent, the assistant superintendent, the foreman, assistant foreman, and head timberman, testified in detail as to how the work was

done; that the mine was thoroughly, completely, and effectively timbered, and the work done in such a manner as to make it safe for the workmen in the Copper level. These witnesses, or most of them, expressed the opinion that the cave which caused the death of Van Buren and others was not the result of defective timbering, but was in fact a "side thrust" resulting from some independent cause, and that the caves and droppings of rock, as testified to by the witnesses on the part of the defendants in error, were but incidents common to mining, and in no wise from want of proper timbering.

There was some testimony to the effect that lateral caves—"side thrusts"—might occur in properly timbered mines, and the plaintiff in error argues that the cave which occurred was of that character, and that it could not be held responsible therefor. Notwithstanding this testimony, several of the witnesses on behalf of the plaintiff in error testified that, if a mine was properly timbered, there would be no falling of rock through from the roof or sides.

John Minear, who had been a miner for 35 years, and at the time of the accident was timber foreman of the Mountain Copper Company's mine, upon his cross-examination said:

"I know what a mine properly timbered is. A properly timbered mine will hold up the ore. It is a pretty hard question to say whether, if a mine is timbered and don't hold up the ore, then it is not properly timbered. There might be something come, like an earthquake, that will shake it down. If a mine is properly timbered, there will be no falling either from the roof or from the side. If not only one car load, but a number of car loads, would come down from the top of the stope, my judgment as a miner would be that that mine was not properly timbered."

There was no earthquake on the night in question.

Archer, the superintendent of the plaintiff in error, testified upon cross-examination that:

"No such a thing happened as three car loads of ore coming down into the place where the muckers were working from the top. If it had, there would be danger. If that ore came from the top, or the roof, and came through the timbers, it would indicate that the mine was not properly timbered."

Charles Knuckey, who had been a miner for 42 years, and was day shift boss, and thoroughly familiar with the method of timbering the mine on the Copper level at that time, upon his cross-examination testified:

"Q. By Mr. Campbell: It is a fact, is it not, that a mine properly timbered will not scale, and will not cave? A. No, sir; it is bound to settle; it does not matter how you timber it. Q. But will the top of the roof drop down? A. It will come gradually on the timbering. It gradually settles on the timbering. Q. Will it drop down on the men? A. How can it drop down on the men if it was timbered? Q. Then, if it is properly timbered, it cannot drop down on the men? A. Of course not. It will not drop down on the men if it is properly timbered. Q. If a mine does cave, and drops down on the men, then, in your opinion as a miner, it is not properly timbered? A. I did not say that. Q. I say, if it does cave, and drops down on the men from above, then, in your opinion as a miner, it is not properly timbered? A. If it drops down on the men, it is not properly timbered."

We are not called upon to discuss the weight of the evidence. That was passed on by the verdict of the jury. It is enough to say that there was ample testimony on the part of the defendants in error to au-

thorize the court to submit the question in issue, as to the negligence of the plaintiff in error, to the jury.

2. Did the court err in refusing to give the instructions requested by the plaintiff in error, or in giving certain instructions of its own motion? The rule is well settled that the court is never required to give instructions in the language used by counsel. The duty of the court is always fully discharged if its charge embraces all of the principles of law arising in the case in the court's own language. This court has in at least two cases expressly so decided. Swensen v. Bender, 114 Fed. 1, 9, 51 C. C. A. 627; Stockslager v. United States, 116 Fed. 590, 599, 54 C. C. A. 46. The courts in other circuits have announced the same rule. Union Pacific v. Jarvi, 53 Fed. 65, 71, 3 C. C. A. 433; Alabama Ry. Co. v. O'Brien, 69 Fed. 223, 16 C. C. A. 216; Western Co. v. Ingraham, 70 Fed. 219, 222, 17 C. C. A. 71; Texas Ry. Co. v. Elliott, 71 Fed. 378, 382, 18 C. C. A. 139; Missouri Ry. Co. v. Fuller, 72 Fed. 467, 469, 18 C. C. A. 641; Boston R. Co. v. McDuffey, 79 Fed. 935, 941, 25 C. C. A. 247. In so declaring, the Circuit Courts have but followed the decisions of the Supreme Court. Indianapolis R. Co. v. Horst, 93 U. S. 291, 295, 23 L. Ed. 898; Anthony v. Railroad Co., 132 U. S. 172, 10 Sup. Ct. 53, 33 L. Ed. 301; Railroad Co. v. McDade, 135 U. S. 555, 575, 10 Sup. Ct. 1044, 34 L. Ed. 235; Marchand v. Griffon, 140 U. S. 517, 528, 11 Sup. Ct. 834, 35 L. Ed. 527; Railroad Co. v. Winter's Adm'r, 143 U. S. 61, 74, 12 Sup. Ct. 356, 36 L. Ed. 71; Hartford Life Ins. Co. v. Unsell, 144 U. S. 439, 447, 12 Sup. Ct. 671, 36 L. Ed. 496.

The practice of taking the instructions as requested by the respective parties, and therefrom formulating a general charge embracing all the matters of law arising upon the pleadings and the evidence, is always to be commended, because in this way the points in issue may be sufficiently declared, and clearly presented to the jury, without unnecessary repetition and verbose language. The court's duty is to simplify its charge to the jury, and make every effort to render it as free from complexity as possible.

Conceding, for the purpose of this discussion, that the instructions asked by plaintiff in error were correct, still, if the principles embodied therein were correctly given by the court in its charge, no error occurred. The record shows that at the close of the charge, when counsel were called upon to announce whether they desired to reserve any exceptions, the following colloquy occurred:

"Mr. Van Ness: I have not, as your honor is aware, in the way in which your honor has given your instructions, been able to determine how closely you may have followed, or to what extent you may have departed from, the instructions requested. While I think you have substantially given the instructions, still you have departed from the language, and I cannot at this moment determine that. In order to preserve the record, if there is any departure from those instructions, I desire to reserve formal exceptions. Under the ruling of the court, it is necessary to reserve exceptions now. The Court: You can have the record appear that it is done in the presence of the jury. * * * Mr. Van Ness: The usual practice is to take an order from the court giving us leave within ten days to specify in writing such exceptions as we may deem proper, and those written specifications to be deemed given, under the rule, in the presence of the jury, and while at the bar. The Court: You can have the record show that you each except. I will say to you, however, I think I have covered all your instructions. Mr.

Van Ness: I think your honor has. Mr. Campbell: That is our opinion, as well. The Court: Some of your instructions were rather leading, which I never give, and some were duplicates of others."

The trial court was too liberal in permitting counsel to have formal exceptions noted, without requiring them then and there to designate the points of their exceptions, before giving further time to formulate them. The court overlooked the object of the rule in this respect, and ignored the repeated and uniform decisions of the Supreme Court and the several Circuit Courts of Appeals upon this subject, to the effect that exceptions to the charge of the court are of no avail unless the record shows that they were taken or reserved while the jury were at the bar. As was said by the court in Harvey v. Tyler, 2 Wall. 328, 339, 17 L. Ed. 871:

"Justice itself, and fairness to the court which makes the rulings complained of, require that the attention of that court shall be specifically called to the precise point to which exception is taken, that it may have an opportunity to reconsider the matter and remove the ground of exception."

The attention of the trial courts, as well as of counsel, is here called to the necessity of enforcing this rule in the method herein indicated; otherwise the appellate courts are not bound to consider them.

After an examination of the instructions asked for by the plaintiff in error, and of the charge of the court upon the points presented by the requested instructions, our conclusion is that the points involved were fully covered by the charge of the court. In fact, the contention of the plaintiff in error is not that the charge of the court is erroneous, but that it "was so worded as to take the minds of the jurors from the proposition to which counsel for plaintiff in error desired to attract their attention." It is the duty of the trial court to enunciate the principles applicable to every material point in as clear and direct language as possible, without attracting the attention of the jury in favor of or against either party. There being two theories as to the cause of the cave in the mine, one of which, if believed to be true by the jury, would exempt the plaintiff in error from all liability, and the other hold it responsible for the injuries resulting from it, and there being evidence to support both theories, it was the duty of the court to impartially submit both theories to the jury by appropriate instructions. We deem it unnecessary to incumber the record with a copy of all the requested instructions, or the instructions given by the court in lieu thereof.

It is claimed, among other things, that the instructions asked by the plaintiff in error expressed the law of this case as given in Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 663, 21 Sup. Ct. 275, 45 L. Ed. 361, and as laid down upon a former appeal herein (Mountain Copper Co. v. Van Buren, 123 Fed. 61, 59 C. C. A. 279), and should have been given; and it is suggested, in this connection, that the court, in its charge, departed from this rule. It is therefore proper to notice some portions of the charge upon this point, to show that the court did not depart from the rule as announced in the cases referred to.

The court charged the jury:

"That an accident occurred, through which Van Buren was killed, is not disputed, but you cannot infer that it resulted from the defendant's negligence simply because it occurred. The negligence must be proven. To main-

tain this action the plaintiffs were compelled to allege that the accident resulted from defendant's negligence, and also they must prove it to your satisfaction by at least a preponderance of evidence."

Again: "During the trial of this case several matters have been referred to, from some of which it might be inferred that the accident happened. I refer to the testimony concerning different caves. You cannot, because the accident occurred, infer or conclude it might have happened from some other cause, unless the evidence points to that. In other words, you must be governed by the evidence. You cannot indulge your imagination, and presume it might have occurred from something other than that which is shown. You must know from the evidence substantially how it occurred, but especially you must know that it was from the defendant's negligence that it occurred. That is the main point."

With reference to another point involved in the instructions which are complained of, the court, in its charge, said:

"I will here call your attention to the evidence upon the vital question in the case—that is, the one I consider the vital question—but I do not intend to indicate any views myself as to what the evidence points to. I leave that for you. The important question is this: You remember the plaintiffs' testimony was to the general effect that as they timbered along in that stope there were large spaces left over the timbering—after the upright posts were placed, and the caps placed on them, and some other timbers on top, there were large spaces left from there to the top of the stope, or the back of the stope, as it is termed; and experts have testified that, if that is so, it would not be good mining. You, of course, will understand that yourselves. You will know that the object of this timbering is to support the roof of the stope. If the timbering does not go up to that, but is simply built up in the air, you will readily conclude it would not be any support. That is, in part, the testimony of the plaintiffs—that the timbering was not placed up against the top of the stope, so as to support the superincumbent mass. On the contrary, the defendant's witnesses testify that the timbering was built up and was made solid against the top of the roof, or the back of the stope, as it is termed in mining. This is one of the important questions for you to determine. I have no suggestions to make to you as to which of the witnesses you must follow. You have their testimony before you, and it is for you to determine how that mining was done."

It is claimed that the court erred in instructing the jury as follows:

"(22) The question in this case that I call your attention more directly to is this: As you have discovered from the testimony of witnesses, there are two kinds of timbering used in large mines. One is what is called the 'square sets,' in which the timbers are all fitted, one on top of each other. Then they are often filled up by throwing in the waste material of the mine, but in that kind of square sets waste material is not necessary, because the timbers are presumed to stand by themselves. In those cases the timbers are about six or seven feet long, under the system adopted. The other mode of timbering, such as was used in this mine, was where the timbers were longer, and were covered with caps; and the proper mode of timbering would be from those caps to carry the timbers up to the top or back of the stope, so as to support the weight. After the timbering had been set, those spaces between the timbers are filled up with rock. The witnesses say that the rock is built in tight, so that the pressure comes not only on the timbers, but also on the rock. The witnesses have testified as to that class of timbering. *You, through your own good sense, can judge whether timbering of that kind would be safe.* I may say to you that both classes of timbering, as the witnesses have testified, and it is not disputed, are approved of, when properly done. That is a question we will come to later on.

"(23) In all industrial pursuits there are risks and dangers of such character that they cannot be foreseen and provided against by the exercise of reasonable care, and which may be said to be incident to the pursuit. For these the master cannot be held responsible, but the servant assumes the risk

of them. Also, when the danger is apparent to the servant, he has the right to object and to cease working, and it becomes his duty to do so if he knows the danger exists; *but when the servant is not advised of the danger, when he is inexperienced,* as is said to be the case here, then it *becomes the duty of the master to give him better care than he would others, to advise him of the danger. If the master advises him of the danger, and the servant then assumes it, it is his own fault, and he must bear the burden himself.*"

"(25) The master is not liable for injury to a servant resulting from the negligence of a fellow servant. This, however, is not a field for mere speculation on your part; but, to apply it to defendant's benefit, you must find from the evidence that the injury resulted from some direct, specific act of carelessness of the fellow servant. If a number of servants are working together in carrying on the general operations of the mine, and do their work in such a generally careless way that accident results, the master is still liable, because it is his duty to see that the general operations and work are properly done; but when the injury results from some direct, careless act of a fellow servant or fellow servants, which can be pointed out distinctly by the testimony, the master is not liable, for he cannot be required to watch and direct each individual act of each of his servants, but he can and must watch and direct their general manner of working. To illustrate that: If two miners are working together in a mine, being fellow servants, and one of them through carelessness loosens a rock in the top of a stope, and drops it down on the head of the other and kills him, that would be the carelessness of a fellow servant, and the master would not be responsible for that. In other words, fellow servants have to bear the results of the acts of their fellow servants, when done in that way; *but when it comes to a number of fellow servants working together, and under the general direction of the master, in carrying out the process of mining, carelessness there is something that the master must assume.*"

. The claims of error are based upon the italicized portions of the instructions. In the consideration of these questions, it must be borne in mind that the entire charge must be taken as a whole. It is always easy to criticise certain sentences, which, taken disconnectedly from what appears before or after, may appear to be erroneous or to convey a wrong impression; but, when construed in the light of all that is said in the charge, it becomes manifest that the jury could not possibly have been misled by the isolated sentence complained of.

These remarks are specially applicable to instruction 22, under review. It is claimed that the italicized portion conveyed the idea to the jurors that it was their duty to determine the fact "through their own good sense," independent of the evidence. The jury was previously charged generally that it was its duty to determine all questions of fact from the evidence. The instruction in question, after the inadvertent expression referred to, explained that both classes of timbering are approved of, when properly done; and in other parts of the charge, not objected to, the court instructed the jury that it was its duty to determine from the evidence whether the work was properly done.

One of the objects of the rule requiring counsel to note their exceptions to the charge before the jury retires is to enable the court to correct omissions or mistakes, if any are inadvertently made. If the attention of the court had been called, as it ought to have been, to the fact that, instead of the jury determining the point "through their own good sense," it should be determined "from the evidence," it would undoubtedly have been corrected.

It is questionable whether this court ought to consider the objections made by counsel to instruction 22.

In Western Coal M. Co. v. Ingraham, supra, the assignment of error was based upon the omission of the word "reasonably" in the phrase "safe place to work." The court said:

"If the defendant intended to except to the absence of the qualifying word 'reasonably,' it should have pointed out the error specifically at the time. It could not object to the whole paragraph, which states the law accurately on one point, and in the appellate court, for the first time, rest its objection on the absence of a single qualifying word, the absence of which no jury would ever perceive, and which the court would readily have inserted if its attention had been called to the technical omission at the time."

The same court, in Western C. & M. Co. v. Berberich, supra, said:

"If every slight defect or slip which a microscopic eye can detect in a question or answer or the charge of the court is to be counted prejudicial error, litigation will become interminable over subtle refinements and quibbles which were not seen or regarded by the judge or jury at the trial, and which had no bearing whatever on the decision of the case on its merits. Such an administration of the law would be intolerable."

We are of opinion that the principle of law announced in instruction 23 is correct. We also think it was applicable to the facts of this case. Van Buren was wholly inexperienced in mining. By going to work as a "mucker," he only assumed the ordinary risks and dangers incident to such employment. He had nothing to do with the timbering of the mine. He had the right to assume (not having any knowledge on the subject) that the timbering would be done by his employer in a proper manner. Union Pac. Ry. Co. v. Jarvi, 53 Fed. 65, 69, 3 C. C. A. 433, and authorities there cited; Western Coal & M. Co. v. Ingraham, 70 Fed. 219, 224, 17 C. C. A. 71; Swensen v. Bender, 114 Fed. 1, 7, 51 C. C. A. 627, and authorities there cited; Bunker Hill & S. M. & C. Co. v. Jones (C. C. A.) 130 Fed. 813, 818.

The vital point relied on by the defendants in error was that the plaintiff in error was careless and negligent in the timbering of the mine, and that the cave was occasioned by such neglect. Touching this theory of the case, the court was authorized to give this instruction.

In Mather v. Rillston, 156 U. S. 391, 399, 15 Sup. Ct. 464, 39 L. Ed. 464, where the plaintiff in the court below claimed that the injuries he received were caused through the carelessness and negligence of the defendant "in storing the powder and caps in the house without informing him of the increased risk and danger of his remaining in employment therein," Mr. Justice Field, in delivering the opinion of the court, called attention to the fact that where occupations which are attended with danger can be prosecuted, by proper precautions, without fatal results, such precautions must be taken, and in this connection, among other things, said:

"So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers, and suffer in consequence, the employers will also be chargeable for the injuries sustained."

It may be said that that was an extreme case. But if the testimony of defendants in error is worthy of belief—and the jury have so found —then the method of timbering in the mine in question left as great a hazard of danger as if powder or other explosives had been stored away in the upper levels. The principles announced by Mr. Justice

Field have been frequently followed in mining, railroad, and other cases. Burke v. Anderson, 69 Fed. 814, 817, 16 C. C. A. 442; Western Coal & M. Co. v. Ingraham, 70 Fed. 219, 221, 17 C. C. A. 71; Western C. & M. Co. v. Berberich, 94 Fed. 329, 333, 36 C. C. A. 364; Cincinnati Ry. Co. v. Gray, 101 Fed. 623, 628, 41 C. C. A. 535, 50 L. R. A. 47; Kelley v. Fourth of July M. Co., 16 Mont. 484, 497, 41 Pac. 273, et seq.

With reference to instruction 25, it is not claimed that Van Buren had anything to do with the timbering of the mine, or that it was any part of his duty to inspect or repair the same.

In Western Coal & M. Co. v. Ingraham, supra, the court said:

"The rule is well settled that, after a mine is once opened and timbered, it is the duty of the owner or operator to use reasonable care and diligence to see that the timbers are properly set, and keep them in proper condition and repair. For this purpose it is his duty to provide a competent mining boss or foreman to make timely inspections of the timbers, walls, and roof of the mine, to the end that the miners may not be injured by defects or dangers which a competent mining boss or foreman would discover and remove. This is a positive duty which the master owes the servant. A neglect to perform this duty is negligence on the part of the master, and he cannot escape responsibility for such negligence by pleading that he devolved the duty on a fellow servant of the injured employé. It is an absolute duty which the master owes his servant to exercise reasonable care and diligence to provide the servant with a reasonably safe place in which to work, having regard to the kind of work, and the conditions under which it must necessarily be performed."

3. This brings us to the exceptions taken to the rulings of the court in sustaining the objections to certain questions asked witnesses by the plaintiff in error. Of the eight assignments on this point, only two are discussed by counsel. These we will notice:

(1) The record shows that the witness Jones testified on behalf of the plaintiff in error that caves occasionally happen without premonitory symptoms of their coming. He was then asked:

"Q. Will you give us an idea as to what it is that will produce caves in mines without any premonitory symptoms of their coming, and notwithstanding the best method of timbering known to your profession? Mr. Campbell: Do you propose to show that any of those things were in existence there at that time? The Court: Unless that is connected with the actual facts as to that particular property, I should think the testimony would be irrelevant. Do you propose to show that some of these occurrences that he will testify to actually existed in that mine? Mr. Van Ness: I do not know whether I can do that or not. The Court: There is only one thing I want to know. I want an answer to the question I put to you, and that is whether you propose to connect his testimony with actual facts? Mr. Van Ness: I propose to rebut the testimony of some of these people that a cave cannot occur if a mine is properly timbered. * * * The Court: The objection is sustained."

We think the ruling of the court was correct. The witness had already testified to the fact which counsel wished to impress upon the jury—that caves might occur in properly timbered mines—and it was then sought to obtain the witness' idea as to what might cause such caves, without reference to any conditions existing at the mine in question. It may be that a hidden cavern filled with flowing water might seep through the upper levels and cause a cave, which human foresight could not guard against. But there is no pretense that anything of that kind existed at the time of the cave in question. It may be that a

volcanic eruption might cause a cave in a mine that was properly timbered, but nothing of that kind is shown to have occurred. The same as to an earthquake, and numerous other imaginary things. The court was right in restricting the testimony to conditions existing at the time, and refusing to enter into the wide field of speculation and conjecture as to what might cause a cave in a well-timbered mine. The question for the jury to determine was whether the cave was caused by the defective timbering of the mine, or by a "side thrust."

(2) The next exception has less merit. Upon cross-examination the witness Pemberthy was asked:

"Q. Did you ever suggest to the foreman or the shift boss or the head timberman, or anybody else, that there was any danger to you yourself while you were working in there by the falling down of that roof because it was unsupported?"

How could the defendants in error be in any manner bound by any omission upon the part of Pemberthy to suggest to the foreman or shift boss or head timberman of the corporation that there was danger in working in the mine on account of the defective timbering? The fact, if it be a fact, that Pemberthy did not report the danger, did not tend to impeach him, and did not tend to contradict his testimony as to the condition of the timbering. The most that could possibly be said is that, if the conditions were such as testified to by him, it would be natural for him to have spoken about it. It would, at best, only show that he was careless, and perhaps negligent, in not reporting the danger.

We have examined the entire record with a view of ascertaining whether or not any prejudicial error occurred at the trial. Our conclusion is that the trial was in all respects fair and impartial, and free from such error.

The judgment of the circuit court is affirmed, with costs.