## RUMELY et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.   July 27, 1923.)

No. 135.

1. **Indictment and information** ⊂⇒71—**Must be clear and exact in statement of offense.**

An indictment must be so clear and exact in its language as to advise the accused and the court beyond doubt of the offense intended to be charged.

2. **Indictment and information** ⊂⇒91(1)—**Statement of offense must necessarily import willfulness.**

While it is the general rule that the term "willfully" cannot be omitted from an indictment when the term is part of the statutory definition of the offense, where the facts alleged necessarily import willfulness, failure to use the word is not fatal to the indictment.

3. **Conspiracy** ⊂⇒43(6)—**Indictment held not insufficient because it failed to allege that objective crime was to be "willfully" committed.**

In a charge of conspiracy, the conspiracy is the gist of the offense, and an indictment charging a "willful" conspiracy to commit an offense against the United States is not insufficient because the word "willfully" is not again used in describing the offense intended to be committed, though willfulness is an element of such offense as defined in the statute.

4. **War** ⊂⇒12—**Debt owing to enemy is "due," within meaning of Trading with the Enemy Act.**

In Trading with the Enemy Act, § 7 (a), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d (a), providing that any person indebted to an enemy shall report the fact to the Alien Property Custodian within 30 days "after such debt shall become due," the word "due" is used in the sense of "owing," and signifies an indebtedness without reference to the time of its maturity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due (in Commercial Law).]

5. **Conspiracy** ⊂⇒27—**Overt act alleged need not be unlawful in itself.**

While in an indictment for conspiracy under Criminal Code, § 37 (Comp. St. § 10201), an averment of some overt act is required, such act need not be in itself unlawful, and it is sufficient if it is alleged that it was done to effect the object of the conspiracy and in pursuance thereof.

6. **Criminal law** ⊂⇒444—**Books of account, properly authenticated, are competent evidence.**

Books of account, kept in the usual and regular course of business, may be admitted in evidence, when supplemented by the oath of the party who kept them.

7. **Conspiracy** ⊂⇒45—***Evidence of pro-German sympathies and activities held admissible on trial for conspiracy to conceal indebtedness from Alien Property Custodian.***

In a prosecution for conspiracy to conceal from the Alien Property Custodian the fact of an indebtedness due from a defendant to the Imperial German government, evidence showing the pro-German sympathies and activities of such defendant in 1914 and 1915 *held* admissible.

8. **Criminal law** ⊂⇒552(1)—**"Circumstantial evidence" defined.**

"Circumstantial evidence" is that evidence which tends to prove a disputed fact by proof of other facts which have a legitimate tendency to lead the mind to a conclusion that the fact exists which is sought to be established.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Circumstantial Evidence.]

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Criminal law ⬅552(4)—Circumstantial evidence must be acted on when satisfactory.**

Circumstantial evidence is legal evidence, and a jury must act on it as if it were direct when it is satisfactory beyond a reasonable doubt.

**10. Criminal law ⬅338(2)—Great latitude is allowed in admission of circumstantial evidence.**

Great latitude is allowed in the reception of circumstantial evidence, especially where it is necessary to show a particular intent in a party as an essential ingredient of the crime with which he is charged.

**11. Criminal law ⬅402(1)—Transcript of stenographic notes held admissible in evidence, when original notes lost.**

Admission in evidence of a transcript of stenographic notes of statements made by a defendant *held* not error, where the stenographer, shown to be competent, testified to the correctness of the transcript and that he made it shortly after the notes were taken, and it was shown that the original notes were lost.

**12. Criminal law ⬅841—Exceptions to instructions must be taken before retirement of jury.**

In the federal courts, exceptions to the charge must be taken before the jury retires.

**13. Criminal law ⬅314—Knowledge may be imputed to defendant from proved circumstances.**

The law, on proof of sufficient facts, will presume that a person has information equivalent in its legal effect to actual knowledge.

**14. Criminal law ⬅1174(6)—Sending of deposition to jury room by consent of counsel held not ground for reversal.**

The sending to a jury after their retirement, among exhibits asked for by them, of a deposition, a part of which has been excluded, when done by consent of counsel, *held* not ground for reversal.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Edward A. Rumely, S. Walter Kaufmann, and Norvin R. Lindheim. Judgment of conviction, and defendants bring error. Affirmed.

Certiorari denied 44 Sup. Ct. 38, 68 L. Ed. ——.

Henry J. Johnson, for plaintiff in error Rumely.

Walter C. Noyes, William L. Wemple, Herbert R. Limburg, and Arthur G. Hays, all of New York City, for plaintiffs in error Kaufmann and Lindheim.

William Hayward, U. S. Atty., of New York City (Harold Harper, Sp. Asst. Atty. Gen., of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The plaintiffs in error have been convicted under an indictment which charged them with having conspired to defraud the United States by obstructing and preventing the United States from seizing and administering a certain indebtedness of the defendant Rumely to the Imperial German government. It was alleged as part of the conspiracy that the defendants should conceal the fact of such indebtedness to the German government, and should make false and misleading reports to the Alien Property Custodian of the United States, and so obstruct and prevent the transfer and payment of that indebtedness to such Custodian. The defendants were acquit-

ted on the first three counts, but convicted on the fourth and fifth. The jury accompanied their verdict with a strong recommendation for mercy.

Counsel for the defendants moved to set aside the verdict and for an arrest of judgment, which motions the court denied. In doing so Judge Grubb said:

"I listened to the evidence with patience for five or six weeks as it was being introduced. I listened to the summing up of counsel, and I am not disposed to say that the jury did wrong in bringing in the verdict which it did."

And in imposing sentence the court said:

"Gentlemen, of course, the question of your guilt or innocence is complete, as far as I am concerned, by the verdict of the jury. I do not have any disposition to criticize the jury's verdict. Now, if I were privileged in passing sentence to consider only the punishment for you individually, I could make the sentence very nominal, in view of the fact that you have already been severely punished. I am sure that you have shown the good reputation which you have borne from exceptional men, and the recommendation of the jury has been for mercy. However, my duty is not confined alone with fixing the sentence, but the court is bound also to consider the duty of enforcement of the law, and in my humble judgment there is no more—no duty that is so outstanding nowadays on the part of a judge than to adequately enforce the law. In this case the jury have found that an important law has been violated by you gentlemen. The law was passed to aid this country in the war, and was vital somewhat to the proper conduct of the war. I think the court would be derelict in its duty if it imposed a nominal sentence for such an infraction of the law as the jury has found in this case. I think the judgment of the court should be substantial. If there are mitigating circumstances, as I am sure there are, I think the proper place for them to be considered is in the plea for executive clemency, and not before the court. In view of that fact, I sentence each of you gentlemen, and all three of you gentlemen, to a term of imprisonment in the Atlanta Penitentiary at Atlanta, Georgia, for a year and a day. I will make it on each count to run concurrently."

We have incorporated these remarks of the court into this opinion because we find ourselves so fully in accord with all that was said. There is no duty which the courts of this country owe to all the people which is more important than to see that law is adequately enforced. It is, of course, the primary duty of the court to see that no man is convicted of crime, except under and in accordance with the law. But if he has been so convicted the punishment to be imposed must be such as to make law respected and to safeguard society and government.

The defendants at the time of their indictment were engaged in business in the city of New York. Each is a citizen of the United States, and each was born in this country. The defendant Rumely was educated at Notre Dame University, in Indiana. He then studied in England, at Oxford University, for something over a year. From there he went to Germany, and spent a year at the University of Heidelberg, and then three years and a half at that of Freiburg. During his sojourn in Germany he appears to have lived on terms of intimacy with some of its leading men. He has been a man of affairs. In 1915 he began negotiations for the purchase of the Evening Mail, an old and well-established newspaper in New York. At the time he purchased

the Mail there was a feeling on the part of many German-Americans that the news from Europe was put over in a one-sided way. As he expressed it:

"There was a great deal of resentment against the biased reports that were coming, and that bias I had recognized was due to the absence of a news flow from the Central Powers."

And he says he saw in that "a very great public opportunity." He thought he could get strong financial support for his proposed purchase of the Mail, as he "intended in that paper to fight the British blockade" which he regarded as unwarranted and illegal.

The defendant Kaufmann is a member of the New York bar, and has been for some years associated with the defendant Lindheim in law practice. He entered Harvard College, but was compelled by serious illness to withdraw from it. As a result of his illness he lost his eyesight. He nevertheless on the restoration of his health, and notwithstanding the loss of his sight, entered Columbia Law School from which he was graduated. He immediately thereafter took the bar examinations and was admitted to practice.

The defendant Lindheim is a graduate of Johns Hopkins University and of the Columbia Law School. He has been a member of the bar of New York for a number of years, and previous to the formation of his own firm served in the offices of several prominent law firms in New York City.

There is much evidence in the record given by leading members of the bar of New York and others as to the excellent character of these defendants. This, as the jury were properly instructed, the law permits to be done, upon the theory that defendants, who have borne good reputations in the community in which they live for right living and honorable conduct, would be less liable to do dishonest or criminal acts than those who are unable to show that they have borne such good reputations. The jury in this case was properly charged:

"If you believe a defendant is guilty, in spite of his previous good character, he should be convicted; but if you believe, after considering all the testimony, that there is a reasonable doubt of his guilt, by reason of his good character, then it would be proper to acquit him because of his good character."

The trial began on November 3, 1920, and occupied 30 court days. During the trial 166 witnesses were examined, 670 exhibits were received in evidence, and the record fills 4 volumes, of 2,139 printed pages. There are 249 assignments of error, which occupy 116 printed pages. Of these assignments of error, 206 relate to the admission or exclusion of evidence, 24 to the charge to the jury, 7 to the denial of motions to set aside the verdict, 8 to the denial of motions to dismiss the indictment, and 3 to the denial of motions requiring the government to elect on which counts it would go to trial. We have on several occasions condemned the practice of taking so numerous assignments of error. The practice is not conducive to the administration of justice in appellate courts. Many such assignments of error are inconsequential, and of so little importance that the court should not be asked to review them.

All three defendants have been convicted of having conspired to defraud the United States. The fourth count charged that the defendants unlawfully, willfully, knowingly, feloniously, and corruptly conspired and agreed with each other to defraud the United States; while the fifth count charged them with having in the same manner conspired to commit an offense against the United States. The gravamen of the crime charged in the two counts is in fact the same. It grows out of the willful failure to report to the Alien Property Custodian, under the provisions of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½ff, 3115½g–3115½j), an indebtedness which the defendant Rumely had contracted with the Imperial German government. The Trading with the Enemy Act, approved October 6, 1917, required by the provisions of section 7(a), 40 Stat. c. 106, p. 416, that any person "who is or shall be indebted in any way to an enemy or ally of an enemy" shall report the fact to the Alien Property Custodian by written statement under oath containing such particulars as the Custodian shall require. The fourth count charged that defendant Rumely was indebted to the Imperial German government in the sum of $1,301,700. The fifth count charged him with being indebted to that government in the sum of $1,451,700. It was a part of the conspiracy alleged that the defendants should conceal the fact of the indebtedness to the German government by making false and misleading reports to the Alien Property Custodian, from whom the true facts were to be concealed.

It appears that on March 18, 1915, defendant Rumely and Samuel S. McClure obtained an option to purchase the New York Evening Mail, a paper published in the city of New York. The option was for the purchase of the property subject to an existing mortgage of $400,000, by the payment of $650,000 in cash, and the issuance to the vendor of $125,000 in second mortgage 6 per cent. notes of the company. Later McClure assigned his interest in the option to Rumely. The contention of the government throughout the trial was that the money which Rumely used in the purchase of this paper came from the Imperial German government. The contract for the sale of the paper was closed on June 1, 1915, when Rumely paid $748,000 by checks charged against his account with the Merchants' Exchange National Bank. The paper steadily lost money after it got into Rumely's hands, and the latter borrowed additional money, for which he gave at one time a note of $750,000.

The testimony discloses that on October 26, 1917, Rumely had an interview with the Chief of the Bureau of Investigation of the Department of Justice. in which interview he informed the Chief that he had received $1,200,000 from the two German-Americans who were in Europe at the time, one of whom was Herman Sielcken; and on a subsequent occasion he told him that the other person who furnished him the money was Mrs. Busch, who was from St. Louis, "the mother of the present head of the Busch family, connected with Anheuser-Busch Brewing Company." Her deposition is in the record, in which she states as follows:

"My name is Lilly Busch. I reside at No. 1 Busch place, in the city of St. Louis, state of Missouri. In the month of May, 1914, I visited Germany, and

returned to the United States in the month of June, 1918. While in Germany, after the beginning of the war, mail from the United Sttates was interrupted frequently, and communication between the United States and Germany for the period of this time was suspended. I at no time furnished to any one any money, by subscription, loan, or otherwise, for the purchase of the New York Evening Mail, or any interest in it."

In the course of the interview between Rumely and the Chief of the Bureau of Investigations, when it was suggested by the latter that, as Rumely had talked the matter over with Dr. Albert, Albert had placed his official approval on the proposition, and the German government had advanced the money to Sielcken and his other associates, who had in turn furnished it to him, Rumely insisted that was not likely; and at no time did he tell the Chief that the money had come through Dr. Albert, or the other German representatives, although the evidence in the record shows quite conclusively that it did come in that way, whether or not it was the money of the German government. On the contrary, Rumely told him that the money had been sent him by private individuals through the Atlantic (Merchants' Exchange) National Bank. In reference to Rumely's statement that the money came in part from Herman Sielcken, the story seems to have been regarded by the jury as improbable as that it came in part from Mrs. Busch.

The claim of the government is that the money with which the defendant Rumely bought the Mail was paid to him by Dr. Albert, and belonged to the Imperial German government, and was part of the proceeds of two German government loans that were financed in the United States, and that the other part of it was money that came from the British government into the hands of Hays, Kaufmann & Lindheim, Albert's lawyers, as the proceeds of a refund or reimbursement for the seizure of the cargo of the steamship Wilhelmina, and therefore was the money of the German government—the Wilhelmina being a German government project. The claim of the defendants is that none of the money that went into the purchase of the paper, or to finance the publication of it thereafter, was the money of the German government. They contend that the money received directly or indirectly through Albert was money which he had received for the account of one Herman Sielcken, and not for the Imperial German government; and they contend that the money in the hands of Hays, Kaufmann & Lindheim, which arose out of the Wilhelmina transaction, and went into the financing of the Mail, was not the money of the German government, but of the Central Purchasing Agency.

It was necessary for the government to satisfy the jury beyond a reasonable doubt, not only that at least some of the money that was used in the purchase of the paper or in its subsequent financing was the money of the German government, but that the defendants knew that it came from that source. The testimony shows that Sielcken, although born in Germany, was an American citizen; that he and his wife were in Germany from April, 1914, until his death, which occurred in November, 1917; that he was living in Germany in retirement, and was very ill with arteriosclerosis. His wife testified that during this period she was constantly with him, and that his condi-

tion of health necessitated it; that he used to talk with her about his business affairs; that he had no place in Germany for the transaction of business; that at the time herein involved he had two bank accounts in Germany, one with a firm in Hamburg, and one with the Rheinische Credit Bank in Baden-Baden; that other than those bank accounts he had no property in Germany of which she had any knowledge; that in 1916 he sent over to his firm in New York for $1,000,000 to purchase bonds; that she was the residuary legatee under his will, and that she still has the bonds which were purchased with that money, and that those bonds had never been pledged to anybody; that she herself had an independent estate. "I myself had property all over Europe," she said. She was asked, "Did you yourself ever invest any money in the New York Evening Mail?" and answered:

"No; I never pledged or mortgaged any of the property that I held in Germany to enable anybody to purchase an interest in the New York Evening Mail. I did not pledge or mortgage any property at all during the time that I was residing over there with Mr. Sielcken."

The government was undertaking to show that Sielcken could not have made the loan for the purchase of the Mail from resources he had in Germany by accounting for his available resources there. This led to the inquiry whether he might have availed himself of a pledge or mortgage of her property for the establishment of a credit to enable him to transmit $1,500,000 to the United States from Germany for the purchase of the Mail. On her redirect examination she testified as follows concerning the investment of $1,000,000 in bonds:

"Do you know for what purpose the income of those bonds were used? A. Yes, sir. Q. Yes? A. The income of those bonds were used for our living over there. Mr. Sielcken had no property in Germany—investing this $1,000,-000 which he had from Mr. Crossman over there to have an income, and to be able to pay the expenses, which we were always drawing, as we stayed over there longer. We only used to stay two or three months before that time. That is why he invested that money over there in bonds, and I am still paying from it over there. The income on those bonds was remitted from Hamburg, and that was expended as we needed it from time to time for our living expenses in House Eden."

She testified without objection as follows:

"Q. Now, Mrs. Sielcken, do you know whether or not your husband was at all times loyal to the United States of America? A. Absolutely. Q. Was Mr. Sielcken acquainted, if you know, with Dr. Albert? A. No; he was not acquainted. Dr. Albert was never introduced to my husband."

Then she was asked: "Now, did you know or hear at any time of the name of Dr. Rumely?" This was objected to as calling for incompetent and irrelevant testimony, and as an attempt to prove something which was a part of the government's case by a negative. The objection was overruled, and she was allowed to answer as follows:

"After my husband's death in November, 1917, I got a newspaper slip from Switzerland, something about Dr. Rumely and the Evening Mail. That was the first time I heard anything about Dr. Rumely. I never heard prior to that time that I have just fixed of Mr. S. Walter Kaufmann, or of the firm of Hays, Kaufmann & Lindheim."

A Mr. Nielsen, who was a member of the New York firm of Crossman & Sielcken, to which Herman Sielcken belonged, during the whole of the time the latter was abroad, and who was intimate with him in his business transactions, was one of the witnesses produced by the government. He testified that the assets of the firm on June 1, 1915, were about $6,000,000, and that the capital was entirely Sielcken's. He stated that he and Sorenson, another member of the firm, participated in the income of the firm, but had no interest in the capital investment; that that was all the personal property of Sielcken's; that in June, 1915, the firm carried perhaps on an average in cash $1,250,000; that Sielcken had no bank account in this country apart from the firm, except a small account with the Columbia Trust Company of New York, which consisted, when he sailed for Europe, of a small balance of $1,200; that he (Nielson) was conversant with all his affairs in this country, and that he practically had no other investments in the United States; that the remittances of the firm to Sielcken while he was in Europe, and prior to the remittance of the $1,000,000 sent him in 1916, were somewhat less than $200,000.

"The firm of Crossman & Sielcken, to my knowledge, never made any contribution from its assets to the New York Evening Mail. We made no payment to the German representatives in the United States on Mr. Sielcken's order from the assets of the firm at any time. I do not know the defendants Rumely, S. Walter Kaufmann, nor Norvin R. Lindheim, nor the other member of the firm of Hays, Kaufmann & Lindheim, Mr. Arthur G. Hays, nor Mr. T. Raymond St. John. None of those gentlemen ever came to the firm of Crossman & Sielcken and consulted with any person there with respect to Mr. Sielcken's affairs. * * * I saw Mr. Sielcken at Baden-Baden in 1915. I was constantly in touch with him at that time. I discussed the affairs of the firm with him. I did not discuss anything with respect to the New York Evening Mail." "Q. Of course, you yourself knew nothing about any New York Evening Mail at that time, as connected with Mr. Sielcken, did you? A. No, sir.

"Mr. Steuer: I object to that as irrelevant—whether he knew or not is immaterial.

"The Court: Objection overruled.

"Mr. Steuer: I except.

"In 1916 I also stopped at Baden-Baden. * * * I was with Mr. Sielcken practically during all of his working hours. I remained at the house almost continuously. His working hours were from breakfast time until dinner, barring pehaps an hour or two that he would retire to his room at mid-day for rest. This was in July, 1916. Mr. Sielcken's health was very bad at that time. As compared with his health in 1915, there was a very marked degeneration or deterioration, I should say, both physical and mental. I attempted to discuss business with him in July, 1916, but we did not get very far. There was no discussion at that time with respect to the New York Evening Mail. * * * While he was speaking about the war he never made any reference to any newspaper project that he had in the United States."

And Mr. Sorenson, also a member of the firm of Crossman & Sielcken, testified as follows:

"I have never met Dr. Rumely. I never made any payment out of the assets of Crossman & Sielcken for the benefit of the New York Evening Mail, or for Dr. Rumely, or any payment for Dr. Rumely, or any payment to the German representatives in the United States, for any purpose whatever. I am still taking part in the liquidation of the firm of Crossman & Sielcken. In the course of that liquidation, I have not come upon any writings of any character, relating to any investment in the New York Evening Mail by Mr.

Sielcken, or any loan for the purpose of enabling some one else to invest in the New York Evening Mail, or in any newspaper proposition."

His testimony shows that he knew Dr. Albert, but never had any communication with him about the New York Evening Mail, or any conversation with respect to any transaction in which the Imperial German government had acted in behalf of the firm of Crossman & Sielcken, and that his conversations with Dr. Albert did not relate to any transaction of Herman Sielcken's at all.

The deposition of Dr. Albert, introduced in evidence on behalf of defendants Kaufmann and Lindheim, was illuminating, and no doubt the jury was greatly helped by it in reaching the verdict they did. Al-bert came to the United States from Germany in August, 1914. According to his own admissions he had entered the service of the government of Germany in 1895, when he was 21 years of age, and from that time to the time when he came to the United States had been continually in the German public service. After the rupture of diplomatic relations between the United States and Germany, he returned to his own country and was made Alien Property Custodian, and later became Under Secretary of State. The following is an excerpt from his deposition:

"Q. You are at the present time Under Secretary of State for the German government, are you not? A. Yes. * * * Q. Then I take it you have been a government man practically all your life, have you not, Dr. Albert? A. Yes. Q. You have never been in private business, have you? A. No."

He earnestly insisted throughout the deposition that he came to the United States "in a private capacity," and that he was here representing the Central Purchasing Company, which was a company formed under German law to send foodstuffs and raw materials from the United States to Germany. But when he came to the United States he had a rank with the German government of Privy Councilor. He and Dr. Dernberg arrived here about the same time, but came on different ships. He admitted that Dernberg brought with him about $150,000,000 in German treasury notes to establish credits, but he only succeeded in selling about $5,000,000 of the notes. That amount was turned over to Albert for the purpose of buying "goods." He was asked as to the $150,000,000 Dernberg brought over as follows:

"Now, then, you expected the proceeds to be turned over to you for the purpose of buying materials to be sent to Germany, didn't you? A. If he had sold them, I certainly should have spent the money."

It appears that, soon after his arrival in the United States, Albert's deposition shows that a German press bureau was established to present the German side of things in America. He was asked as to William Bayard Hale and his connection with a news sheet put out by the press bureau:

"Q. Well, but you do know whether he was connected with it, don't you? A. I don't remember. Q. But you paid him $15,000 a year for his services, didn't you, Dr. Albert? A. I don't know. Q. Then do you know whether the Hamburg-American Line paid Wm. Bayard Hale $15,000 a year or not? A. No; I don't know that either."

But Albert did remember that he paid $200,000 to Rumely or Hammerling for an advertisement which appeared in the foreign language press of the United States, and which was entitled "An Appeal to the American People." He was asked whose $200,000 it was which he paid for that advertisement, and replied, "I don't know that, because I acted upon the authority of Dr. Dernberg in that matter." He was discussing with Samuel Untermeyer the advisability of the purchase of an interest in the New York Sun. In his deposition the following appears:

"Q. But you had correspondence with Mr. Untermeyer about purchasing a newspaper in the United States, now, didn't you? A. 1 don't think I had such correspondence, but I remember one day Mr. Untermeyer wrote to me he intended to buy the Sun, and wanted to know whether I would not take a minority interest in it. Q. Do you mean by that that Mr. Untermeyer wanted to know whether you personally would not take a minority interest in the Sun? A. Certainly not I personally. Q. But who was it who was to take this minority interest, then? A. I don't remember. Q. Do you remember sending a cablegram to Berlin on that subject, Dr. Albert? A. 1 think I did. Q. Yes; and to whom was that cablegram addressed? A. To the Foreign Office. Q. And that cablegram was in connection with that minority interest Mr. Untermeyer wanted you to take in the New York Sun, was it not? A. Putting these things together, I conclude that it was."

Soon after his arrival in the United States, Albert began discussing the purchase of a newspaper out of German government funds. The purchase of the New York Evening Mail and Harpers Weekly, among others, were under consideration. Albert says:

"I may even state that various points were discussed, with these people who were interested in the idea, whether it would be advisable to have a government paper, or have the money put in by private people; but after mature consideration we all dismissed the idea of having the government put in the money. That was for obvious reasons, gentlemen; we were sure it would ruin the paper. Q. Well, Dr. Albert, you mean, if the fact became known, it would ruin the paper, do you not? A. The situation is this gentlemen: Here is the difficulty. If you run a paper in German, if you pay money out of government funds to run that paper you have to pay it through so many hands, you have to pay it through so many departments, that it is practically impossible to have it not known. Q. Yes; the fact is Dr. Albert you were spending a good deal of money for the German government but not for a newspaper. Is that it? A. Certainly. Q. And not all of the money was being spent for purposes which you were making public? A. Certainly not. I was acting as a kind of secretary for a great many concerns and for the Embassy too and when they told me to pay a certain amount of money to somebody 1 paid it. Q. And you brought with you a very considerable amount of money which was the property of the German government didn't you? A. No. Q. Then, when did you first come into control of money which belonged to the German government, and with the power to spend it? A. I think it was soon after Dernberg came here—it may have been very soon after."

In March, 1915, Albert and Rumely were conferring about the purchase of the Mail. Albert states that Rumely's idea was that he would get some German-Americans, like Sielcken and Busch, or Mrs. Busch, of St. Louis, to buy the stock of that paper, and that he wanted to get into touch with them in Germany, and wanted Albert's aid in getting into touch with them. In May Albert informed Rumely that he had been placed in funds for the account of Sielcken, and that the latter

was ready to invest money in the newspaper. This was right after the incident of the Lusitania. The statement follows:

"Q. Can you state, Dr. Albert, just exactly what you said to Dr. Rumely, and what Dr. Rumely said to you, on that occasion? We would like to get this conversation as complete as possible. A. The substance of the conversation has been this: I told Rumely that I had been placed in funds for the account of Sielcken, and that Sielcken wanted me to give him a loan. Then Rumely said: 'No; that is not my proposition. I want Sielcken to invest in stocks.' And so I told him. No; I told him that I had not been authorized to put any money in stocks for Sielcken. Sielcken only wanted to give him a loan. Then Rumely said to me: 'Very well; if you have no authority to buy stocks for your principal, then you give me money as a loan.' Then the conversation naturally continued into the details as to the condition of that loan, the amount of money which he was to get, and so on. I know we agreed; at first it was a smaller sum, but finally I think we agreed on about $750,000, as I remember it. I told Rumely that Sielcken was ready to give him that loan, and he was at liberty to sell stocks from another loan. In fact, we wanted Rumely to do that, in order to redeem the loan as soon as possible. I think that was practically the end of it, gentlemen."

It was agreed that Rumely should have entire control of the paper, that the right to appoint the board of directors should be in him, and that he should have absolute control of the editorial policy of the paper. In June, 1915, Albert says he gave the money, $750,000, to Kaufmann, who had been his lawyer throughout the whole affair, with instructions to turn it over to Rumely as a loan for the purchase of the Mail. The following excerpt is also instructive:

"A. About this mentioning Sielcken's name? I told him not to mention it.

"Mr. Powell: Now, in that same conversation in which you said you had been placed in funds for the account of Mr. Sielcken, did you say anything about the possibility of there being some one else interested in this proposition with Mr. Sielcken? A. I think I told him it was Sielcken and possibly one other.

"Mr. Powell: Did Dr. Rumely say anything to you, or suggest the name of anybody as a person whom that other might be? A. I think he mentioned Mrs. Busch, but I don't remember very well. It may be.

"Mr. Powell: And what did you say in reference to that suggestion of his? A. I think he said it might be possible, but I am not informed about it."

As is also the following:

"Q. Now, what did you report to Mr. Sielcken about this? A. I did not report to him at all. Q. Did you ever write to him about this? A. No; I did not. Q. Did you ever cable to him about it? A. No; I did not. Q. Or communicate with him in any way? A. No; I did not, not directly. Q. Indirectly? A. Certainly I did. Q. Through whom did you communicate with him? A. Dernberg went over and straightened it out. Q. And did he cable to you? A. No; why should he? Q. Did he write to you about it? A. No. Q. Did Mr. Sielcken write to you about it? A. No. Q. Did the German Foreign Office communicate with you about it? A. I don't think so. Q. Did any person in Germany communicate with you about it? A. I don't think they did. Q. That is to say, before you went to employ Mr. Kaufmann to put through these transactions, resulting in the purchasing of the Evening Mail and the loan of $750,000 to Edward A. Rumely, you did not have any communication with any person in Germany? A. No; but with Dernberg. Q. Where was he then? A. In New York. Q. Dr. Dernberg was still in New York? A. Yes. Q. Did he show you any communication from any person in Germany? A. He simply told me, 'You are authorized to pay this money for Sielcken.' Q. Did he give you any money to pay it with? A. No; I took it out of the funds I had. Q. Well, and which funds were they? A. I

handled a great many funds as a banker, and I took it out of them. Q. Where did you get those funds? A. From a great many sources, by German banks, by the little loan we had placed in the United States. * * * Q. And one expenditure you did make was this matter of $750,000, which you made without a scrap of writing of any sort? A. But the word of Dernberg. * * * Q. Now, then, on the simple word of Dr. Dernberg you agreed to turn over $750,000 to Dr. Rumely? A. Certainly I did; and again and again I would do it. Q. You didn't care what Mr. Sielcken thought of it, did you? It was enough for you that Dr. Dernberg said, 'Pay him the money.' Isn't that it? A. No; I would not say that. But if Dr. Dernberg says to me that a man of Mr. Sielcken's standing and reputation wants to give a loan of $750,000, these two men were entirely good for me. Q. But, as a matter of fact, you did not look behind Dr. Dernberg, did you? You never did have a word of writing from Mr. Sielcken about it, did you? A. No; and I did not expect it. * * * Q. You really hadn't a scrap of writing from Mr. Sielcken, or a wireless telegram, had you? A. Nothing. Q. You hadn't a cablegram, had you? A. No; but I have to add that that was nothing unusual which could have worried me at all. * * * Q. This Rumely matter was a case where you were spending the money of somebody in Germany, was it not? A. Yes. Q. And the cables were still open, were they not? A. No. Q. But the wireless was open, wasn't it? A. Yes; to a certain extent, all under the control of the American government. Q. But you were sending cipher messages weren't you? A. Yes; but the capacity of the two stations was limited. * * * Q. But did not Dr. Dernberg take time to communicate with Mr. Sielcken? I think I asked you that, and you said, 'No.' Is that correct? A. If you asked me that, I must have said, 'I don't know.' Q. But you could have communicated with him by wireless, had you so desired, of course? A. I think it would have been possible. Q. Was this $750,000 your own money? A. It was legally; yes. It was mine as a banker, but I was responsible for it to Mr. Sielcken. Q. Oh, had he deposited the money with you? A. No; it was practically my own money. I gave him a credit, though, as a banker does. I did that on the word of Dr. Dernberg, because Sielcken wanted to make the loan. Q. That is to say, with no knowledge on your part as to whether Dr. Dernberg had communicated with Mr. Sielcken or not, you spent $750,000 for him? A. Yes. Q. And without any knowledge as to whether or not Dr. Dernberg was in communication with Mr. Sielcken? A. Yes. Q. And that money was put into a newspaper, and the only security which you got for the loan was the stock of that newspaper? A. Yes; or I did not get it. He pledged the stock. Q. So that you lent $750,000, representing a principal, with absolutely no security, excepting the success of the enterprise itself. A. The newspaper; yes."

In this connection it is observed that the general manager of the Tuckerton radio station in 1914, 1915, 1916, and 1917 testified that the station was, during the period named, in direct communication with the station near Hanover, and that our wireless station was open for business during the period mentioned, and received and transmitted freely messages to Germany. "The wireless service was open to everybody," he said. "You could transmit freely up to February, 1917." The testimony discloses that Albert knew little about Sielcken, except that he was "a kind of a coffee merchant," and was at that time in Germany. He also knew of his firm in New York.

"Q. Did you know the address of the firm in New York? A. I don't know the number. Q. Did you ever go there? A. No; never. Q. Didn't he have some representative in New York? A. Certainly. Q. Did you ever discuss this purchase with any of them? A. Certainly not."

Again:

"Q. And the accounts of the Evening Mail were kept by you in the government ledger, were they not? A. No; they were kept in a separate account,

which, according to my recollection, was the Perez account. Q. What was the meaning of 'Perez'? A. I don't remember. I have thought that over very often, but I cannot remember why I used the name. * * * Q. Who was it that suggested the name 'Perez'? A. I don't remember that. Q. Did the words Evening Mail appear in that account? A. No; I think they did not appear. I don't remember them appearing anywhere in that. Q. Did the words Evening Mail appear in that account? A. There appeared only Perez. Q. Did the name of Herman Sielcken anywhere appear in that account, sir? A. No; the name Perez was chosen in order to cover the name of Sielcken. Q. The name Perez was used, so that any one looking at that account would not know whose account it was, then? A. Yes; exactly. Q. And the word Perez was used to cover Sielcken's name? A. Yes."

After Albert had loaned $750,000 to Rumely for the purchase of the Mail, he had from time to time loaned additional amounts to him in order to keep the paper running. The following is an excerpt from Albert's testimony on this point:

"Q. As a matter of fact, in this case there was advanced from funds under your control, for the purpose of financing the Evening Mail, in all a total of $1,451.600? A. Was it as high as that? I should have thought perhaps $1,300,000; but that is immaterial. Q. It amounts, roughly, to a little less than a million and a half dollars—rather more, at least, than $1,300,000. So that the first advance of $750,000 was, in fact, only about half the money which was actually diverted to this enterprise by you—speaking roughly, now. A. After looking at these figures to-day, I see there is no doubt about it. Q. So that, while the $750,000 was not only the first, but the largest, single step that you took, Dr. Albert, the fact was that afterwards a sum nearly as large was put into that enterprise, now wasn't it? A. I never realized it was nearly as much, but I knew it was a very high sum. Q. That is a pretty substantial sum to me, Doctor? A. Yes. Q. And a sum large enough to be worthy of rather serious consideration? A. Yes. Q. Especially to one who is representing other people, whether a government or private individuals. A. Yes. Q. Do you know why it was that no note was taken for those subsequent advances until on January 1, 1917, a note for $551,000 was taken from Dr. Rumely? Do you know why that was? A. I don't know why; I am even surprised myself. According to my recollection, we should have taken a note every time we advanced money to the people. Q. The amount of $551,000 includes the transaction carried through the name of Stevenson, doesn't it? A. Yes. Q. So you cannot help us with any explanation of the fact that, although those very large advances were being made through Mr. Kaufmann and Dr. Rumely and yourself, no notes or documents representing any securities to the persons who advanced the money were taken? A. If there were no notes, I cannot give any explanation for it."

And this also:

"Q. You know that the money which you actually paid over was not money which had come from Sielcken, don't you? A. Yes. Q. Then, Doctor, to get this perfectly clear, the money which you gave into the hands of Dr. Rumely, that particular money, was not sent to the United States by Sielcken, and did not come from any fund of Sielcken's in the United States? A. No. Q. And the most that Dr. Dernberg's statement could convey to you was that Dernberg had stated that Sielcken would reimburse the fund from which you took the money; that is all you understood? A. What I understood was that I was authorized to pay for his account. Q. Pay for Sielcken and he would reimburse it? A. Yes. Q. Did Mr. Sielcken at any time to your knowledge ever pay over any money to any person any money to replace the money which you paid to Rumely? A. I know nothing about that. Q. Did any person, acting in behalf of Mr. Sielcken, ever pay to any person, as far as you know, any money for the purpose of replacing the money which you paid to Rumely? A. I know nothing about it. Q. Have you ever made any inquiry

of anybody as to whether Mr. Sielcken, or his estate, has ever made any payment to anybody for the purpose of reimbursing the money which you paid out? A. In the United States I could not, and in Germany I did not."

And after the United States entered the war against Germany, and it became necessary for Albert to return to his own country, before he sailed from the United States, he left, according to his own admission, $150,000 in the hands of Kaufmann, to be loaned to Rumely, if the latter needed the money. The testimony about this follows:

"Q. Dr. Albert, shortly before you sailed from the United States, there was $150,000 transmitted to Mr. Kaufmann, to be loaned to Dr. Rumely, was there not? A. Yes. Q. State, if you please, what connection you had with that transaction. A. Before I sailed from the United States, I said to Mr. Kaufmann, 'Here are $150,000, which you credit to the account of Sielcken, and from this money you pay any further loans which may be necessary to Rumely. It means, if Rumely comes again for loans you pay it out of this $150,000.' Q. Do you remember whether you personally handed the money to Mr. Kaufmann or not? A. No; I don't recollect, but I don't think so, because I never handed money to people myself. Q. Do you know in what form the money was transmitted to Mr. Kaufmann? A. Well I think we stuck to the habit of handing it over in cash, but maybe I paid it in a check. I don't remember."

The defendant Kaufmann was Albert's legal adviser in respect to all matters relating to the Mail, and he states that he left to him all legal details. In all cases Albert states that he "gave" all the money paid to Rumely to Kaufmann, who was to turn it over to Rumely as a loan.

The private secretary of Dr. Dernberg, who was his secretary during his stay in the United States, and who was born in Germany, testified as follows:

"Q. From the time you entered Dr. Dernberg's employ in September, 1914, to the time he left the United States on June 12, 1915, did you ever hear the name of Herman Sielcken or Mrs. Busch in the office? A. Never.

"Mr. Baldwin: I object to that as being no testimony at all.

"The Court: Well, it is negative; but, for what it is worth, I think it is competent.

"Mr. Baldwin: I except.

"The Witness: I was Dr. Dernberg's private secretary; I had access to his files and papers. Q. Did you ever see the name of Herman Sielcken, or Mrs. Busch, in any of the files or papers in his office? A. Never."

One Claussen, who was employed in the German press bureau heretofore mentioned in connection with the activities of Albert, and whose duties consisted in sending out news items from the German side to the American papers, testified that this news was furnished gratuitously by the papers. He was an employee of the Hamburg-American Line, and was asked by its directors to aid Dr. Albert and Dr. Dernberg in getting out the German side. When the Hamburg-American Line reduced salaries, they reduced his salary with the rest, but assured him that an additional allowance would be made him; and he testified that this additional allowance was paid him by Dr. Albert.

We have given an incomplete statement of the evidence which we find in the voluminous record, but it serves at least to indicate the character of the evidence which was laid before the jury in this case.

*The Indictment.*—At the opening of the trial, and before any jury-man was sworn, certain motions were made to dismiss the indictment, on the ground of its insufficiency. These motions were all denied, and so far as they affect the fourth and fifth counts, upon which the defendants have been found guilty, they must now be considered.

The objection to the fourth count is the failure to charge that defendants conspired that the defendant Rumely should willfully fail, neglect, and omit to report to the Alien Property Custodian; whereas, the count charges conspiracy to commit an offense contrary to the provisions of the Trading with the Enemy Act, and that act provides that an offense thereunder shall consist of the willful violations of its provisions. The objection to the fifth count is similar; the word "willfully" not having been used in describing the conspiracy therein charged.

The fourth count of the indictment, after reciting various matters not necessary now to refer to, and that Edward A. Rumely, at the times specified, then and there being within the United States, was indebted in the sum of $1,301,700 to an enemy of the United States, the Imperial German government, and that the three defendants, each well knowing all the matters and things alleged—

"unlawfully, willfully, knowingly, feloniously, and corruptly did conspire and agree with each other, and with divers other persons whose names are to the grand jurors unknown, to defraud the United States, by obstructing, impeding, hindering, and delaying the United States in, and preventing the United States from, seizing, capturing, receiving, holding, administering, assuming the control of and title to said indebtedness of the said Edward A. Rumely in the sum of $1,301,700 as aforesaid, to the said Imperial German government, an enemy of the United States as aforesaid."

"That it was a part of said conspiracy and agreement that the defendants should conceal from the Alien Property Custodian the fact that the said Edward A. Rumely was indebted as aforesaid to said Imperial German government; that it was a part of said conspiracy and agreement that the defendant S. Walter Kaufmann, on behalf of the firm of Hays, Kaufmann & Lindheim, should make and render to said Alien Property Custodian a misleading, false, and fraudulent report and statement with respect to said indebtedness; that it was a part of said conspiracy and agreement that the defendants Norvin R. Lindheim and Edward A. Rumely should make a misleading, false, and fraudulent report and statement to said Alien Property Custodian with respect to said indebtedness; that it was a part of said conspiracy that the defendants should withhold and conceal from the United States and from the Alien Property Custodian the true facts with respect to said indebtedness; and that it was further a part of said conspiracy and agreement that the defendants should obstruct, impede, hinder, delay, and prevent the transfer, assignment, and payment of the said indebtedness to the said Alien Property Custodian."

The fifth count of the indictment, after reciting various matters not necessary now to consider, and that by virtue of the Trading with the Enemy Act passed by Congress and approved on October 6, 1917, it became and was the duty of every person in the United States who was indebted in any way to an enemy of the United States to report the fact to the official of the government of the United States known as the Alien Property Custodian, and setting forth the time within which such report had to be filed, and after stating that at the times specified the defendant Rumely, then and there being within the

United States, was indebted in the sum of $1,451,700 to an enemy of the United States, to wit, the Imperial German government, continued as follows:

"That on October 6, 1917, and continuously thereafter to and including December 20, 1917, the said Edward A. Rumely, S. Walter Kaufmann, and Norvin R. Lindheim, herein indicted and hereinafter called the defendants, and the said S. S. McClure Newspaper Corporation, which is not herein indicted, each well knowing all the matters and things hereinabove alleged, at the Southern district of New York and within the jurisdiction of this court, unlawfully, knowingly, willfully, feloniously, and corruptly did conspire and agree with each other, and with divers other persons whose names are to the grand jurors unknown, to commit an offense against the United States; that is to say, the said persons did conspire and agree that the said Edward A. Rumely, being indebted as aforesaid to the said enemy, should fail, neglect, and omit to report to said Alien Property Custodian within the period prescribed by law as aforesaid, and the extension thereof by the President as hereinbefore set forth, the fact that he was indebted as aforesaid to said enemy."

It becomes necessary, therefore, to consider whether the omission to charge that the defendants conspired that defendant Rumely should "willfully" fail, neglect, and omit to report to the Alien Property Custodian made the indictments invalid.

[1] It is a rule of criminal pleading that the indictment must be free from all ambiguity, and leave no doubt in the mind of the accused, and in that of the court, as to the exact offense intended to be charged. This is required, so that the accused may know what he is called upon to meet, and also that upon a plea of former acquittal or conviction it may appear with accuracy what the exact offense was to which the plea relates. Evans v. United States, 153 U. S. 584, 587, 14 Sup. Ct. 934, 38 L. Ed. 830. And see United States v. Hess, 124 U. S. 483, 487, 8 Sup. Ct. 571, 31 L. Ed. 516; Miller v. United States, 133 Fed. 337, 341, 66 C. C. A. 399; Fontana v. United States (C. C. A.) 262 Fed. 283, 286; Goldberg v. United States (C. C. A.) 277 Fed. 211, 215. And in Pettibone v. United States, 148 U. S. 197, 203, 13 Sup. Ct. 542, 545 (37 L. Ed. 419), the court, speaking through Chief Justice Fuller, stated that:

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means."

[2, 3] The general rule is that the term "willfully" cannot be omitted from an indictment when the term is part of a statutory definition. Wharton's Criminal Procedure (10th Ed.) vol. 1, §§ 285 and 318. But it has been held that, where the facts alleged necessarily import willfulness, the failure to use the word "willfully" is not fatal to the indictment. Howenstine v. United States (C. C. A.) 263 Fed. 1; Holsman v. United States, 248 Fed. 193, 160 C. C. A. 271; Nickell v. United States, 161 Fed. 702, 88 C. C. A. 562; Van Gesner v. United States, 153 Fed. 46, 53, 82 C. C. A. 180. And in Williamson v. United States, 207 U. S. 447, 28 Sup. Ct. 171, 52 L. Ed. 278, it is said:

"In a charge of conspiracy, the conspiracy is the gist of the crime, and certainty to a common intent, sufficient to identify the offense which the de-

fendants conspired to commit, is all that is requisite in stating the object of the conspiracy."

And see, to the same effect, Crawford v. United States, 212 U. S. 183, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392; Goldberg v. United States (C. C. A.) 277 Fed. 211, 213; Anderson v. United States, 260 Fed. 557, 171 C. C. A. 341; Gould v. United States, 205 Fed. 883, 126 C. C. A. 1; Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581; United States v. Claflin, 25 Fed. Cas. 433, 435.

We fully recognize that, in the interest of the orderly procedure of the courts and for the adequate protection of the rights of a person accused of crime, an indictment must be declared invalid unless it clearly and exactly sets forth the crime charged. But we are bound to say that, after careful reading of the fourth and fifth counts of the indictment, we are unable to see but that they fulfill the tests prescribed by the courts in the cases cited, and that they are sufficient to support the convictions.

[4] It is objected that the fifth count is insufficient, because it failed to allege that the debt "due" to the enemy of the United States, and which it was necessary to report to the Alien Property Custodian, had become "due." It is said that section 7(a) of the Trading with the Enemy Act did not require the report as to a debt until 30 days "after such debt shall become due." That portion of the act herein involved may be found in the margin.[1] The allegation in the count is that Rumely "was indebted in the sum of $1,451,700 to an enemy of the United States." And the contention is that the word "due" means "matured," and that under the statute it was not necessary that fixed obligations payable in futuro should be reported. We are not able to concur in this view. The word "due" signifies a simple indebtedness, without reference to the time of payment. This is the primary meaning of the word, and we think that it was used in this sense in the section of the act under consideration. It appears to us that Congress intended that the Alien Property Custodian should be given information as to all debts to alien enemies whether they had or had not matured. Such a construction of the act promotes efficiency in the collection of the debts owing to enemies, and the statute must be construed with refer-

[1] "Any person in the United States who holds or has or shall hold or have custody or control of any property beneficial or otherwise, alone or jointly with others, of, for, or on behalf of an enemy or ally of enemy or of any person whom he may have reasonable cause to believe to be an enemy or ally of enemy and any person in the United States who is or shall be indebted in any way to an enemy or ally of or to any person whom he may have reasonable cause to believe to be an enemy or ally of enemy, shall, with such exceptions and under such rules and regulations as the President shall prescribe, and within thirty days after the passage of this Act, or within thirty days after such property shall come within his custody or control, or after such debt shall become due, report the fact to the alien property custodian by written statement under oath containing such particulars as said custodian shall require. The President may also require a similar report of all property so held, of, for, or on behalf of, and of all debts so owed to, any person now defined as an enemy or ally of enemy, on February third nineteen hundred and seventeen. * * *" 40 St. ch. 106. Sec. 7-a, p. 416 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d).

ence to the object which it was intended to accomplish, and given that construction which is best calculated to advance its object. We see no sufficient reason for supposing, as the plaintiffs in error contend, that it was the intention of Congress that an indebtedness need not be reported until 30 days after its maturity.

The Century Dictionary defines "due" as follows:

"6. In law: (a) Owing, irrespective of whether the time of payment has arrived; as, money is said to be 'due' to creditors, although not yet payable; (b) Presently payable; already matured; as, a note is said to be 'due' on the third day of grace."

In Webster's Dictionary it is defined as follows:

"1. That which is owed; debt; that which one contracts to pay or do, to or for another; that which belongs or may be claimed as a right; whatever custom, law or morality requires to be done; a fee; a toll."

It contains no reference to the maturity of the debt or thing owed. And in the Standard Dictionary it is defined as:

"That which is owed or rightfully required; a debt or obligation."

In 1832 the Supreme Court in United States v. State Bank of North Carolina, 6 Pet. 29, 35, 8 L. Ed. 308, construing the Act of March 3, 1791, 1 Stat. 515, which provided that in cases of insolvency "the debt due to the United States shall first be paid," held, in an opinion written by Mr. Justice Story, that the word " 'due' is plainly used as synonymous with owing," and included all debts, whether payable in præsenti or not. There are many cases in which the word in its primary and proper sense is held to mean simply owing. See Crocker-Woolworth National Bank v. Carle, 133 Cal. 409, 411, 65 Pac. 951; Sather Banking Co. v. Briggs Co., 138 Cal. 724, 732, 72 Pac. 352; Barber Asphalt Paving Co. v. Woodbury County, 137 Iowa, 287, 289, 114 N. W. 1044; Tally v. Brown, 146 Iowa, 361, 125 N. W. 248, 140 Am. St. Rep. 282; Pope v. Matthews, 125 Ga. 341, 347, 54 S. E. 152; Metropolitan Store & Saloon Fixture Co. v. Albrecht, 70 N. J. Law, 149, 56 Atl. 237; Sand-Blast File Sharpening Co. v. Parsons, 54 Conn. 310, 7 Atl. 716. The word "due" is sometimes used to express the idea of the maturity of the debt. This is to use the word in its secondary meaning. That the interpretation we have placed upon the word "due" in the provision of the act in question clearly appears from the words which immediately follow that provision. Those words are:

"The President may also require a similar report of all property so held, * * * and of all debts so owed to any person now defined as an enemy or ally of enemy. * * *"

It is evident "due" and "owed" have been used as equivalents.

[5] *Overt Acts.*—Each of the five counts in the indictment alleged the commission of overt acts. There are five such acts set forth, and they are the same in each of the counts. The acts charged are:

(1) That the defendant Rumely made the report to the Alien Property Custodian.

(2) That he wrote and signed a certain letter, accompanying the report, which he caused to be delivered to the Alien Property Custodian.

(3) That he wrote and signed a certain other letter, explanatory of the report, which he also caused to be delivered to the Alien Property Custodian.

(4) That the defendant Kaufmann made a report and sent it to the Alien Property Custodian.

(5) That the defendant Lindheim assisted in making the report that Rumely made.

At common law no overt act is necessary to constitute the offense of conspiracy. O'Connell v. Reg., 11 Cl. & F. 155; United States v. Lancaster, 44 Fed. 896, 10 L. R. A. 333; United States v. Watson (D. C.) 17 Fed. 145; People v. Mather, 4 Wend. (N. Y.) 229, 21 Am. Dec. 122. But under the federal statutes some overt act in pursuance of the conspiracy is a necessary element of any offense against the United States. Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; United States v. Hirsch, 100 U. S. 33, 25 L. Ed. 539. But in the case now under consideration the overt acts are not only charged in the indictment, but it is conceded that the acts were done.

It is assigned for error, however, that the averments in the fourth and fifth counts, as to the overt acts, are insufficient. But the assignments do not point out in what respect the insufficiency consists. An overt act is one which manifests the intention of the doer to commit the offense. In Gruher v. United States, 255 Fed. 474, 477, 166 C. C. A. 550, this court took occasion to say that there is no rule of law which requires an overt act to be an unlawful act. "It may be," it was there said, "in itself a perfectly lawful act, which becomes unlawful only when it is committed 'in pursuance of and to effect the object' of the conspiracy. It was not necessary to allege in what manner the overt act would tend to effect the object of the conspiracy." In the case now before the court the fourth and fifth counts charge that the overt acts were done "to effect the object of said conspiracy and in pursuance thereof." And that is all-sufficient. Frohwerk v. United States, 249 U. S. 204, 209, 39 Sup. Ct. 249, 63 L. Ed. 561.

*Evidence.*—It was necessary in this case for the government to show that the $750,000 that went into the purchase of the Evening Mail, or the $700,000 more or less that subsequently went into the financing of it after its purchase was the money in whole or in part of the Imperial German government. It was also necessary for the government to show that the defendants, or at least two of them, knew that the money, or some of it was the money of that government. All of the evidence introduced in the case was for the purpose of establishing one or the other of these two issues. It is conceded that the money which purchased the paper was paid to Rumely, either directly by Dr. Albert or indirectly by Albert's subordinates, acting by his direction. A great deal of evidence was introduced, and, as already stated, there are no less than 206 assignments of error relating to the improper admission or rejection of evidence. Many of them are of little or no importance and have been practically abandoned on this appeal. It is

neither necessary nor advisable that we should undertake to review them in detail. We have examined those upon which the defendants chiefly rely, and we are satisfied that no errors were committed in the admission or exclusion of testimony, which would justify us in revers· ing the judgment and granting a new trial.

[6] It is assigned for error that the court received in evidence books of account of banks and trust companies and of Dr. Albert, and that entries from such books of account were read from or testified to by witnesses. There is no doubt that books of account, kept in the usual and regular course of business, may be admitted in evidence when supplemented by the oath of the party who kept them. Bates v. Preble, 151 U. S. 149, 151, 14 Sup. Ct. 277, 38 L. Ed. 106; Insurance Co. v. Weide, 14 Wall. 375, 20 L. Ed. 894; Insurance Co. v. Weide, 9 Wall. 677, 681, 19 L. Ed. 810; Chaffee & Co. v. United States, 18 Wall. 516, 541, 21 L. Ed. 908.

[7] It is assigned for error that the court permitted evidence to be received showing the defendant Rumely's pro-German sympathies and activities in 1914 and 1915, and his presence at certain conferences which appear to have been held at stated times at 1123 Broadway, in New York City, at which conferences Dr. Albert, Dr. Dernberg, and other prominent Germans were present. The admissibility of circumstantial evidence in criminal cases is so well established that it is not necessary to cite authority in its support. If such evidence were to be excluded, few convictions could be obtained. Commonwealth v. Webster, 5 Cush. (Mass.) 295, 52 Am. Dec. 711; Pittman v. State, 51 Fla. 94, 41 South. 385, 8 L. R. A. (N. S.) 509.

[8-10] Circumstantial evidence is that evidence which tends to prove a disputed fact, by proof of other facts which have a legitimate tendency to lead the mind to a conclusion that the fact exists which is sought to be established. Bouvier's Dictionary. It is legal evidence, and a jury must act upon it as if it were direct, when it is satisfactory beyond a reasonable doubt. 1 Greenleaf, Evid. § 13. In Commonwealth v. Jeffries, 7 Allen, 548, 83 Am. Dec. 712, the Supreme Judicial Court of Massachusetts, in an opinion written by Chief Justice Bigelow, in considering the admissibility of circumstantial evidence and the difficulty of determining with precision the line which separates the limits of just and reasonable inference from those of mere conjecture or surmise, said:

"But as a safe, practical rule it may be laid down that in no case is evidence to be excluded of any fact or circumstance connected with the principal transaction, from which an inference as to the truth of a disputed fact can reasonably be made." "This rule is especially applicable when it becomes necessary to show a particular intent in a party as an essential ingredient in the crime with which he is charged."

And in Holmes v. Goldsmith, 147 U. S. 150, 164, 13 Sup. Ct. 288, 292 (37 L. Ed. 118) the Supreme Court declared its opinion respecting this kind of evidence as follows:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances, the more correct their judgment is

likely to be. 'The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth.' Stevenson v. Stewart, 11 Penn. St. 307. The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are specially unwilling to reverse cases, because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

[11] It is assigned as error that the court permitted to be received in evidence an original transcript of notes made by a stenographer employed by the Bureau of Investigation in the Department of Justice. The stenographer testified that he made the transcript from his notes, and that he made a correct transcript of the statements made by defendant Lindheim, which he had taken down in shorthand at an examination of Lindheim by the Department of Justice and transcribed a few days afterwards, although he had no recollection as to what Lindheim said, and the transcript did not refresh his recollection. He was shown to be an expert stenographer, and held two medals awarded by the National Shorthand Reporters' Association in 1920, and that he had won the contest for the championship of the United States for speed reporting.

The original notes from which the transcript was made were not produced—the witness stating that the last he saw of them was in the Bureau of Investigation. A witness from the Department of Justice testified that she had searched the files of the Department of Justice and was not able to find them. She testified:

"We have all the Rumely file together, everything in connection with it, and I looked very carefully in it."

We think that no error was committed in admitting the transcript in evidence. Insurance Co. v. Weide, 9 Wall. 677, 19 L. Ed. 810; Insurance Cos. v. Weide, 14 Wall. 375, 380, 20 L. Ed. 894; People v. Randazic, 194 N. Y. 147, 156, 87 N. E. 112.

*The Charge.*—The charge occupies 45 printed pages, and requests to charge and rulings thereon cover 38 additional pages. The District Judge, who charged the jury, is an able, learned, and experienced Judge. His instructions to the jury appear to have been very carefully prepared. They were certainly clear and illuminating. It is, of course, possible for any judge, however able and experienced he may be, to fall into error in instructing a jury. It is claimed that happened in this case in that portion of the charge which related to the knowledge or lack of knowledge on the part of the defendants, or any of them, that at the time they made their report to the Alien Property Custodian they knew some of the money that went into the purchase of the Evening Mail was money of the Imperial German government. After charging the jury that it was necessary for the prosecution, not only to establish the fact that the money that went into the Mail was the money of the German government, but in addition thereto that at that time the defendants, or two of them, knew that this money belonged to the German government, the court instructed the jury very fully

upon the subject of knowledge. What was said upon that subject may be found in the margin.[2] No exceptions to the charge on this subject

2 "Now, that makes it necessary to define what 'knowledge' is, in law; and so far as actual knowledge is concerned, of course, it is no different in law than in fact. You all know what actual knowledge is, and the law puts no different meaning on it. Whatever is in a man's mind at the time is within his knowledge. But there is another kind of knowledge that sometimes obtains at law, that is a little different from actual knowledge, and that is what is called imputed knowledge—where knowledge is imputed to a man. Now, that can only happen in this way: If knowledge is required to make out an offense, then the man must either have actual knowledge in his own mind, or he must be in such a position as that he believes the fact that he is charged with knowledge of, and purposely refrains from obtaining that knowledge when the knowledge is at hand, if he would make the effort to obtain it.

"In other words, when he shuts his eyes and says, 'I do not want to know, because I do not want to be fastened with knowledge,' that, the law says, is the equivalent of actual knowledge. If a man is only prevented from knowing by his willful act, in abstaining from finding out, because he does not want to be fastened with knowledge, then the law says he has knowledge, though in fact he has not, being only prevented from having it by his desire not to acquire it. That does not mean, however, that a man has knowledge who has suspicions, and who negligently fails to make inquiry as to the facts he suspects, to see whether they are true or not, when that is done through a negligent omission, and not a willful intention to keep from knowing the facts. The law does not impute knowledge to anybody, even though he may be suspicious, and negligently fails to follow out those suspicions, by inquiry to determine the truth. In other words, where it is due to negligence, and not to a willful purpose not to acquire the knowledge, it does not amount to knowledge, because knowledge, in order to fasten a crime on a man, must be either actual knowledge or imputed knowledge of the crime as I have mentioned to you.

"Now, the question is, then, whether these defendants, or two of them, had knowledge, either actual or imputed of the character of this money, if you find it to have been money of the Imperial German government.

"Now, knowledge or the want of knowledge is just as much a question of fact, as I see it, as whether the money was Imperial German government money or not, in fact. Therefore it is also a question of fact for your determination, in which I can only be of a little assistance to you, and that in the way of telling you the method of proof, rather than anything with relation to the different facts that may show knowledge, or its absence. Knowledge may be shown, of course, by direct testimony, like anything else. Even though it is in a man's mind, it may be susceptible of proof by direct testimony. For instance, if a man should tell another man that he knew a fact, that other man could testify to his statement or admission, that would be direct proof of knowledge on his part; or he might write a letter in which he might state that he knew a fact, which would be to the same effect; or he might testify on the witness stand, in court, that he knew a fact to be true. That, however, is not the only way, and possibly not the most ordinary way, that knowledge may be proved, because knowledge, being a mental condition, undisclosed, cannot always be proven by direct or express testimony, and frequently must be proven by circumstances; that is, it may be inferred by the jury from circumstances that are offered in its proof, though there is no direct proof of its existence. For instance, one way of proving it is to show the connection or relationship that the party who is charged with knowledge has to the fact that it is desired to charge him with knowledge of—for instance, as being so intimately in contact with or so close to it that the jury could infer from the testimony that he could not have been in that close or intimate contact without inferring its existence, and even though there was no direct proof that he knew it, and in spite of his denial of knowledge of it.

were taken before the jury retired. On the next day the following occurred:

"Mr. Steuer: We are very much worried about something this morning, your honor. I am going to ask your permission to take an exception to your charge of imputed knowledge. Everybody seems to think there is no such thing as imputed knowledge in a criminal case.

"The Court: I can only do that with consent. The law is you must take exception before the jury retires. I do not think it has any bearing on the case. I do not see how I can give you an exception, after the jury retires, except by consent of counsel all around.  *  *  *

"Mr. Steuer: Have the record show this: After the jury had retired, and before the jury reported any verdict to the court, the defendants respectfully request the court to note the following exceptions to the court's charge:

"To that portion of the court's charge in which it defined knowledge, and particularly in which it stated that knowledge may be of two kinds, actual and imputed, and then proceeded to define imputed knowledge, and instructed the jury that if they found imputed knowledge, or the facts which would impute knowledge in the way that the court's charge defined it, then the jury would have the right to find that there was actual knowledge, and that the law would impute knowledge to the defendants, although the defendants did not have knowledge in fact."

It is objected that by this charge the issue of knowledge, whether established by direct proof or by inference to be drawn from facts and

"But in either case, whether proof be direct or by circumstances, or by inference from circumstances, the proof must be of such a character as to convince the jury beyond a reasonable doubt that the party charged with knowledge had that knowledge. Now, you are to look at all the evidence in the case that you think fairly reflected on this question of whether the defendants here had knowledge or not, either by way of direct proof, such as admissions, if there are any, or by way of circumstances which might tend to show their relationship to this fact, as to whether the money that went into the Evening Mail was money of the Imperial German government, or upon the idea that they had such close and intimate contact with the matter that they must have known that it was money of the Imperial government, or whether their contact was so remote that you would have a reasonable doubt in inferring from it that they must have known that the money that went into the Evening Mail was in fact money of the Imperial German government.

"Now, the evidence that relates to the fact as to whether the money that went into the Evening Mail was money of the Imperial German government or not is the same as to each defendant, of course. There is no distinction as to that. If the fact as to its German character be established as to one defendant, it will be established as to all defendants, because all the proof that relates to that fact equally affects all the defendants. Therefore, if you find the money to be German Imperial government money as to one defendant, you would naturally find it as to all the defendants.

"Now, that is not true, however, as to the question of knowledge—as to whether they had knowledge of it or not. The evidence with respect to each defendant in that regard is different in this case. For instance, the government contends that the Wilhelmina transaction is evidence of knowledge, not only that it is evidence to show that the money that went into the Mail, part of it, was German Imperial government money, but also that it tends to fasten knowledge on the defendant Lindheim of its character. Now, of course, the relation of the three defendants to the Wilhelmina transaction is manifestly different in the case of each defendant. Dr. Rumely is not shown to have had any knowledge of or connection with it at all. Mr. Kaufmann says he has none, and there is, as I told you before, when we discussed that question, some evidence, that of Mr. Lemke, whom you will remember, which possibly connected Mr. Kaufmann with it, by showing that he was present at some of the conferences. That, however, Mr. Kaufmann denies. Now,

circumstances, was taken away from the jury; that they were in effect told that a man might be convicted of a crime of which knowledge was an essential element without having any knowledge, provided he willfully abstained from obtaining it; that the court in effect charged as a legal conclusion that guilt followed if the defendants failed to inquire.

The defendants Kaufmann and Lindheim had testified that it was their belief throughout the whole transaction that Sielcken was the principal in the matter of the loans to Rumely. There was no direct proof that the defendants Kaufmann and Lindheim knew that the Ger-

---

Mr. Lindheim does not deny that he had a connection with the Wilhelmina transaction. So that that evidence, if it has any bearing on the question of knowledge, its bearing would be very different, of course, in the case of the defendant Lindheim than it would be in the case of the other two defendants, Mr. Kaufmann and Dr. Rumely.

"And so as to the evidence that relates to the purchase of the Mail, and the transactions involved in the purchase of the Mail, as well as these connected with the advances of money subsequently, to finance the Mail. Those were conducted by Mr. Kaufmann, while Mr. Lindheim seems to have had very little, if any, connection with that part of it; but Dr. Rumely, of course, did have, because he was the recipient of loans in that matter, and Mr. Kaufmann, representing Dr. Albert, was the party through whom the money was paid, so that, so far as those transactions, if at all, relate to the question of knowledge of the German government character of the money, they would naturally have more effect on Dr. Rumely's case and on Mr. Kaufmann's case than they would on Mr. Lindheim's case.

"These are mere illustrations. What I mean is, the evidence being before you as to each defendant on the question of knowledge, you are to consider it separately, based on the testimony that you may be of the opinion relates to the knowledge of that particular person. And, of course, you might find that one defendant only had knowledge, or that two of the defendants had knowledge of that, or that three of them had knowledge of it, or that none of them had knowledge of it.

"Now, if you find, of course, that no one of them had knowledge, that would result in an acquittal of all of them, even though you believed that it was money of the Imperial German government that bought and financed the Evening Mail. If none of them is shown, to your satisfaction, beyond a reasonable doubt, to have had knowledge of the character of the money, even though you believe that it was in fact the money of the Imperial German government, then the fact, if it be a fact, that it was money of the Imperial German government, would not make out a case for the government, and you would have to acquit the defendants; and so it would be, also, if but one of them had knowledge, but no more.

"If your finding be that one of the defendants had knowledge of its German government character, if that be the fact, but no more, then there could not be a conviction of any of the defendants, but they should all be acquitted, because of the fact that a conspiracy is charged as the sole crime, and it requires at least two, under the United States law, to form a conspiracy. So if, of the three defendants two were ignorant, and one alone had knowledge, there could naturally be no conspiracy charges sustained. But if you are satisfied beyond a reasonable doubt that any two of the three defendants had knowledge that the money that went into the purchase and the financing of the Evening Mail was money of the Imperial German government, then that would be enough; you would not be required to find that all three of them had knowledge, if you find that any two of them had it. That is, it would be enough to find that any two defendants had knowledge of the German government character of that money, if that be the fact; and, of course, if all three of the defendants had knowledge of that fact, if it be a fact, and acted in concert, then it would make all three parties to the unlawful conspiracy."

man government was the principal in the transaction. These two defendants claim that the testimony disclosed no facts which would warrant the jury in finding guilty knowledge on their part and that if the testimony tended to establish such facts the question whether the inference of guilty knowledge was to be drawn therefrom was for the jury, but that the court invaded the jury's province, and did not permit them to determine whether they would or not draw the inference of guilty knowledge.

[12] In Phelps v. Mayer, 15 How. 160, 14 L. Ed. 643, decided in 1853, Chief Justice Taney, commenting on the fact that no exceptions were taken to the charge before the jury retired, said:

"We think this objection cannot be overcome."

After saying that the rule requiring an exception to be taken to the charge before the jury retires was not a mere formal or technical one, he declared:

"It was introduced and is adhered to for purposes of justice; for, if it is brought to the attention of the court that one of the parties excepts to his opinion, he has an opportunity of reconsidering or explaining it more fully to the jury."

And in Star Co. v. Madden, 188 Fed. 910, 110 C. C. A. 652, this court applied the same rule and declared that it had been repeatedly applied in this circuit. See Miller & Lux v. Petrocelli, 236 Fed. 846, 150 C. C. A. 108; Alverson v. Oregon-Washington Railroad & Navigation Company, 236 Fed. 331, 149 C. C. A. 463; Beatson Copper Co. v. Pedrin, 217 Fed. 43, 133 C. C. A. 29; Copper River & N. W. Ry. Co. v. Heney, 211 Fed. 459, 128 C. C. A. 131; Arizona & New Mexico Ry. Co. v. Clark, 207 Fed. 817, 125 C. C. A. 305; Mountain Copper Co. v. Van Buren, 133 Fed. 1, 66 C. C. A. 151; Yates v. United States, 90 Fed. 57, 32 C. C. A. 507; Western Union Telegraph Co. v. Baker, 85 Fed. 690, 29 C. C. A. 392; Merchants' Exchange Bank v. McGraw, 76 Fed. 930, 22 C. C. A. 622; Johnson v. Garber, 73 Fed. 523, 19 C. C. A. 556; Railway Co. v. Spencer, 71 Fed. 93, 18 C. C. A. 114; Stone v. United States, 64 Fed. 668, 12 C. C. A. 451; Park Bros. & Co. v. Bushnell, 60 Fed. 583, 9 C. C. A. 138; Sutherland v. Round, 57 Fed. 467, 6 C. C. A. 428; Bracken v. Railway Co., 56 Fed. 447, 5 C. C. A. 548; Price v. Pankhurst, 53 Fed. 312, 314, 3 C. C. A. 551. The cases show that the courts regard a strict enforcement of the rule essential to the proper administration of justice.

In 8 Encyc. of Pleading & Practice, 264, it is stated:

"Exceptions to instructions given should be taken at the close of the charge and before the jury retire, otherwise they will be too late."

And in Zoline's Federal Criminal Law & Procedure, vol. 1, sec. 446 it is said:

"The rule in relation to exceptions to instructions is that the matter excepted to shall be so brought to the attention of the court before the retirement of the jury as to enable the judge to correct his instructions."

[13] The law, upon proof of sufficient facts, will presume that a person has information equivalent in its legal effects to actual knowl-

edge. Dunlap v. Denison, 83 Kan. 757, 112 Pac. 598, 31 L. R. A. (N. S.) 1071. And mere belief is sometimes tantamount to knowledge, Commonwealth v. Leonard, 140 Mass. 473, 4 N. E. 96, 54 Am. Rep. 485; Commonwealth v. Kronick, 196 Mass. 286, 82 N. E. 39; State v. Gargare, 88 N. J. Law, 389, 95 Atl. 625; United States v. La Fanti (D. C.) 255 Fed. 210. And in Pomeroy's Equity Jurisprudence (3d Ed.) vol. 2, § 594, the author says:

"Within the meaning of the rules, notice may, I think, be correctly defined as the information concerning a fact actually communicated to a party by an authorized person, or actually derived by him from a proper source, or else presumed by law to have been acquired by him, which information is regarded as equivalent in its legal effects to full knowledge of the fact, and to which the law attributes the same consequences as would be imputed to knowledge."

[14] *Exhibits Sent to Jury.*—It appears that after the charge to the jury, but before the jury retired, the counsel for the government asked:

"Will your honor order that the jury may have such of the exhibits as they may desire?"

To which the court replied:

"Yes, gentlemen; if you have occasion to want any of the exhibits, you may have them. I do not suppose you want all of them at the outset; they are quite numerous."

Thereupon the counsel for Rumely said:

"With respect to the exhibits put in by Dr. Rumely, which have been lost, we have an agreement with counsel that they can be substituted by copies."

Whereupon the court stated:

"Unfortunately Dr. Rumely's exhibits were lost and, if you have occasion to want them, you will get the copies, and not the originals."

The jury then retired. The next afternoon (Saturday) they returned their verdict, having been out nearly 24 hours. On the following Monday morning, and just before sentence was pronounced, counsel for the defendants moved to set the verdict aside, basing the motion upon the following, among other, grounds:

"* * * That during their deliberations, after the court had charged the jury and they had withdrawn to consider of their verdict, the jury requested and obtained the stenographic record of a portion of the testimony in the case, and read and considered such testimony in their jury room, in the absence of the court and of the defendants."

It developed that in the course of the jury's deliberations they sent to the clerk for certain exhibits, and that the clerk sent them to the jury, including among them a deposition of Dr. Albert's which had been received from Switzerland. Portions of that deposition had been admitted in evidence, and portions had been excluded. But the whole deposition was sent to the jury. It is admitted that it had not been marked as an exhibit, but was a file paper. In reply to a question from the court, the clerk stated that whatever he sent to the jury had been sent with the knowledge and consent of counsel on both sides. The United States attorney stated that he had no knowledge with respect to the deposition going before the jury, and that the matter had not

been called to his attention, and that he was not present when it was done. Both representatives of the government said that they knew nothing about it. The leading counsel for Rumely stated that the thing had been done without his knowledge, and that he was not present when it was done, and that it would not occur to him "under any circumstances to consent to the taking to the jury of a deposition which had not been read" (into the evidence). And one of the counsel for the defendants Kaufmann and Lindheim said that he had learned of the fact by hearing somebody say the jury had the deposition.

We accept denials of knowledge as truthful, but no one challenged the truth of the clerk's positive statement, which the court below particularly inquired into and accepted. The court then overruled the motion, and in doing so said: "I do it on the clerk's statement." In view of the fact that each counsel who denied having consented to the sending in of the papers to the jury simply spoke for himself, and no one undertook to say that none of the counsel associated with him had consented, the clerk's statement remains uncontradicted that nothing was sent in without the knowledge and consent of counsel on both sides. There were present at the time this colloquy took place other counsel representing each defendant, who said nothing although they had ample opportunity to speak. It cannot be doubted that, if the consent had not been given, as the clerk unequivocally asserted, these counsel would not have remained silent, but would have strenuously denied it. If the papers had been sent to the jury without the consent of counsel, it might be claimed that the verdict was vitiated by the error committed. But there can be no doubt that counsel might consent to waive their objections to evidence offered and excluded, and after consenting to have the papers go to the jury they cannot now have the verdict set aside on that account. It is the duty of counsel, as well as of the court, to ascertain what papers are delivered to the jury. State v. Tucker, 75 Conn. 201, 203, 52 Atl. 741. 2 Thompson on Trials, § 2591. The defendants' counsel knew about Dr. Albert's deposition, and that part of it had been excluded from evidence, and they should have directed the court's attention to the excluded portions and asked to have them sealed up, or the jury instructed not to look at them, when the court told the jury that, if they had occasion to want any of the exhibits, they might have them.

It is not unusual in a criminal case to permit papers which are in evidence to be taken by the jury on their retirement. Johnson v. Commonwealth, 102 Va. 927, 46 S. E. 789; Burton v. State, 115 Ala. 1, 22 South. 585; State v. Tucker, 75 Conn. 201, 52 Atl. 741; State v. Lewis, 69 W. Va. 472, 72 S. E. 475, Ann. Cas. 1913A, 1203; State v. Taylor, 36 Kan. 329, 13 Pac. 550; State v. Raymond, 53 N. J. Law, 260, 21 Atl. 328; State v. Shaw, 73 Vt. 149, 50 Atl. 863; Davis v. State, 91 Ga. 167, 17 S. E. 292; Grayson v. State, 40 Tex. Cr. R. 573, 51 S. W. 246; Russell v. State, 66 Neb. 497, 92 N. W. 751; State v. Williams, 34 La. Ann. 959; State v. Tompkins, 71 Mo. 613; State v. Gibson, 29 Iowa, 295; Howard v. People, 27 Colo. 396, 61 Pac. 595; Bersch v. State, 13 Ind. 434, 74 Am. Dec. 263; Cooke v. People, 134 Ill. App. 41, affirmed 231 Ill. 9, 82 N. E. 863; McCandless v. Commonwealth,

170 Ky. 301, 185 S. W. 1100; State v. Champoux, 33 Wash. 339, 74 Pac. 557. The common-law rule on this subject is expressed in Vicary v. Farthing, Cro. Eliz. 411, that:

"Writings or books which are not under seal cannot be delivered to the jurors, without the assent of both parties; but being delivered by the court without the assent of the parties, neither of the parties can avoid the verdict, in regard they were given in evidence before."

This means to imply that as respects writings under seal the assent of the parties would not be necessary; but as respects writings not under seal the court, with the consent of the parties, might allow them to be delivered to the jury. See State v. Raymond, 53 N. J. Law, 260, 21 Atl. 328; State v. Stover, 64 W. Va. 668, 63 S. E. 315.

In Winters v. United States, 201 Fed. 845, 120 C. C. A. 175, the Circuit Court of Appeals for the Eighth Circuit held that the defendant had waived any right to object to certain letters which had been introduced in evidence, but not read, when the trial judge stated that he would permit them to be taken by the jury to their room when they retired to be read to them. This course was pursued, the defendant making no objection. "This," said the Court of Appeals, "was a matter which the defendant could waive." It was added:

"It would be better practice, however, to have the letters either read to the jury, or given to the jury, and each one of the jurors required to read them, while the case was on trial, rather than to have them take them to the jury room, to be there first read."

In 2 Thompson on Trials, § 2575, the law is stated as follows:

"The modern practice is believed to be to send to the jury room all documents and papers, other than depositions, which have been received in evidence. In the absence of prohibitory legislation, it is certainly in the discretion of the judge to permit such papers to be taken out by the jury; in some states it is provided by statute that it may be done; and ordinarily a verdict will not be set aside because it has been done, unless prejudice appears to have resulted from it."

And in section 2578 the same writer, referring to the exclusion of depositions, says:

"The rule which thus excludes depositions from the jury room is not an absolute one; it yields in most opinions to the discretion of the trial court, and consequently new trials are generally refused on this ground, even where the deposition is procured by the jury without the authority of the court, and certainly where it does not appear that it got into their hands against the objection, or without the knowledge of the complaining party."

And in section 2579 it is also said:

"But, where the deposition contains portions which were excluded, the same presumption arises as in other cases where incompetent testimony has been admitted, namely, that it influenced the verdict improperly; and unless this presumption is repelled by what elsewhere appears in the record, an appellate court will reverse the judgment. But it is the duty of counsel to see that only the proper papers are taken by the jury when they retire, and, in the absence of fraud or artifice, a verdict will not be disturbed because incompetent evidence may, through the neglect of counsel whose duty it was to prevent it, have fallen into the hands of the jury."

The omission of comment upon all the errors assigned must not be construed as due to the failure of the court to consider them. We have examined this case carefully, the indictment, the admission and exclusion of evidence, the charge of the court, and whatever errors have been assigned. We have found no sufficient reason, in any of the errors assigned, which would justify this court in setting the judgment aside. The defendants had a fair trial under a valid indictment. The jury has found them guilty, and we cannot say that there was no evidence which could justify the verdict which has been rendered.

Judgment affirmed.